UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBIN OLEBARA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-1487 (JR) |
| | ) | |
| HENRY PAULSON, | ) | |
| Secretary of the Treasury, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

The Office of Thrift Supervision ("OTS") is a bureau of the United States Treasury Department responsible for the oversight and regulation of federally-chartered savings associations. Unlike many federal agencies, OTS receives no appropriations from Congress; the agency's operating budget is funded by periodic assessments on the thrift institutions it regulates. From 1999 to 2002, OTS ran a $25 million deficit caused by stagnant assessment income and increasing expenses. Because most of the agency's budget goes to personnel expenses, in early 2002, the new head of the agency decided to conduct a reduction-in-force ("RIF") and realignment of the agency's structure in order to balance the budget. This realignment and RIF remade the agency from top to bottom. One of OTS's five regional offices was abolished, 20% of the agency's workforce was laid-off, and administrative functions were both consolidated and curtailed.

Plaintiff, in 2002 a 48 year-old grade TG-12 Administrative Secretary II in the competitive civil service, was one employee out of the 206 whose positions were abolished in the RIF. In lieu of release, Plaintiff chose to retire from federal service,

effective July 26, 2002.[1]  At the time she was notified of her RIF, Plaintiff was informed

that she was eligible for job-outplacement assistance through the Treasury Department

Career Transition Assistance Program and the agency's Priority Placement Program.

Plaintiff did not seek other employment.  Plaintiff's only response to the agency-wide

RIF was to file a complaint of retaliation and discrimination which now results in this

lawsuit.

In the administrative proceedings below, Plaintiff raised three complaints which

were accepted for investigation:

> Whether the [Plaintiff] was discriminated against on
> the basis of her race (African American), color (dark
> complexioned), sex (female), age (48) and/or in retaliation
> for prior EEO activity when the agency terminated her
> employment from the position of Secretary, TG-12,
> effective effective July 27, 2002, as a result of a reduction
> in force (RIF).
> Whether the [Plaintiff] was discriminated against on
> the basis of her race, color, sex, age, and/or in retaliation
> for prior EEO activity when the agency delayed submitting
> her retirement package to the Office of Personnel
> Management (OPM).
> Whether the [Plaintiff] was discriminated against on
> the basis of her race, color, sex, age, and/or in retaliation
> for prior EEO activity when, after her termination was
> effected, she was not later offered the position vacated by a
> white male employee (amendment filed on October 1,
> 2002).[2]

---

[1]    Because Plaintiff was age 48 when she chose to retire, her Civil Service
retirement annuity was reduced approximately 14% - a 2% reduction per year for each
year she was under age 55.  *See* Publication RI 83-6, "Early Retirement Under the Civil
Service Retirement System" at 1.  This publication is available for retrieval at
http://www.opm.gov/forms/pdfimage/RI83-6.pdf

[2]    In her administrative complaint below, Plaintiff alleged that the Defendant
discriminated and retaliated against her by not offering her a position in the procurement
field that was vacated by James Harden, a White male, a vacancy which was not
subsequently filled by the agency.  Plaintiff dropped this allegation from her Complaint
in this lawsuit.  This Court has already determined that she was not qualified to fill the
(footnote continues)

*See* Def. Ex. 1, Record of Investigation ("ROI") at 46.[3]

The proceedings below included:

1) a December 24, 2002 714-page agency-level Record of Investigation ("Def. Ex. 1" or "ROI");

2) an April 8, 2003 agency decision on her complaint, based on the agency-level investigation ("Def. Ex. 2");

3) a July 31, 2003 ruling on Plaintiff's appeal of the agency's decision, by an Administrative Judge of the Merit Systems Protection Board ("MSPB") ("Def. Ex. 3");

4) a July 30, 2004 decision by the board of the MSPB on the Plaintiff's appeal of the Administrative Judge's initial decision ("Def. Ex. 4");

5) a January 26, 2006 final agency decision affirming the finding of no discrimination ("Def. Ex. 5");

6) a February 23, 2007 decision on Plaintiff's appeal of the final agency decision by the Office of Federal Operations ("OFO") ("Def. Ex. 6"); and

7) a May 17, 2007 decision on Plaintiff's petition for reconsideration of the denial

---

procurement position occupied by Harden. *See Olebara v. Summers*, C.A. No. 00-2374 (JR) (D.D.C. December 5, 2001) Slip Op. at 11-12, *aff'd on summary disposition sub nom. Olebara v. O'Neill,* 2002 U.S. App. LEXIS 12518 (D.C. Cir. May 24, 2002). Another federal discrimination lawsuit filed by Olebara against the Defendant was settled by payment of $5,000 and $3,500 in attorney fees in 1995. *See Olebara v. Office of Thrift Supervision*, C.A. No. 93-1592 (RMU) (D.D.C.).

[3]     The ROI is consecutively bates stamped with a bold number at the bottom center of each page, from 1 to 714, so as to distinguish this number for citation purposes from other numbers, handwritten or machine produced, which might otherwise appear on individual pages.  Because most of the ROI consists of copies of regulations or other items which are not relevant to this motion, Defendant has submitted only the applicable excerpts from the ROI that are cited to the Court in its Motion.  Plaintiff was previously served a paper copy of the original ROI as well as a complete bates stamped copy of the ROI with the instant motion.

of her appeal by the OFO ("Def. Ex. 7").

All of these reviews were resolved against Plaintiff. Plaintiff now files this lawsuit under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[4]

In the instant lawsuit as well as in the administrative proceedings below, the Plaintiff has failed to offer a single witness to support her claim that unlawful discrimination or reprisal caused her to be released from federal service. Moreover, Plaintiff has failed to identify a single piece of documentary evidence which supports a finding that the 2002 RIF was motivated by discriminatory or retaliatory animus. *See* Plaintiff's Deposition, Def. Ex. 8 at 25-29. *See also* Def. Ex. 9 (interrogatory answers and responses to document production request admitting absence of evidence to support Plaintiff's case).

Plaintiff fails to establish a *prima facie* case of discrimination or reprisal as defined under the case law. Even if Plaintiff were able to set forth a *prima facie* case, there is no evidence to show that the agency's proffered reasons for conducting the RIF

---

[4]    The *pro se* Complaint lists "violation of the Fifth and Fourteenth Amendments of the United States Constitutions; Title VII of the U.S. Civil Rights Act of 1964, Federal Equal Employment Opportunity (EEO) Laws; and, Civil Service Reform Act of 1978 (CSRA). The Plaintiff was treated differently in regards to the employment rights established by the Office of Personnel Management (OPM); and, OTS's policies and procedures. As a result, the Plaintiff wishes enforcement of legal rights to proceed with a complaints in accordance with the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794 (c). Equal Pay Act, Age Discrimination in Employment Act, Title VIII." Complaint at 2. Plaintiff's administrative remedies were exhausted, however, only with respect to the Title VII and ADEA claims. *See* Def. Ex. 6 at 1.

were false or a pretext for discrimination. For the reasons set forth below, the Defendant

is entitled to summary judgment on the Complaint.[5]

## II.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material

fact, and the moving party is entitled to judgment as a matter of law. *See generally*

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

Summary judgment is also appropriate where there is "a complete failure of proof

concerning an essential element of the nonmoving party's case." *Celotex,* 477 U.S. at

323.

---

[5]    In her Complaint, the Plaintiff advances a number of additional instances of
alleged discrimination and retaliation beyond those which she complained of in the
administrative proceedings below, including:

   *    An extended discussion of alleged misconduct by the Court in rendering a
        decision against her in the earlier case *Olebara v. Summers*.  *See*
        Complaint at 7.
   *    A claim that the agency denied "Plaintiff placement with 'Career
        Assistance'" *Id.* at 3.  *But see* ROI at 239 (showing agency notified
        Plaintiff of her eligibility for enrollment in career assistance).
   *    A claim that the agency provided the "Plaintiff with improper and
        incorrect instructions to file an EEO complaint."  *See* Complaint at 3.  *But
        see* ROI at 23-25 (extensive counseling by agency EEO counselor with
        Plaintiff) and ROI at 15-20 (EEO complaint of Plaintiff).
   *    Provided the Plaintiff with a "close-out appraisal approved by someone
        other than the Plaintiff assigned reviewing official."  *See* Complaint at 3.
        *But see* ROI at 167 (close-out performance evaluation conducted by
        Plaintiff's supervisor on July 19, 2002).

Plaintiff has not exhausted her administrative remedies as to these or other
perceived wrongs, and to the extent her Complaint extends beyond the three specific
issues raised by her and investigated below, summary judgment must be entered against
her for failure to exhaust those remedies. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C.
Cir. 1995); *Robinson v. Chao*, 403 F. Supp. 2d 24, 31 (D.D.C. 2005); *Contreras v.
Ridge*, 305 F. Supp. 2d 126, 131-35 (D.D.C. 2004) (Robertson, J.).

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to plaintiff's discrimination and retaliation claims. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Holbrook v. Reno*, 196 F.3d 255, 260, 263 (D.C. Cir. 1999). That framework involves three steps. First, the plaintiff must establish a *prima facie* case of discrimination. If she succeeds in doing that, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions. *Holbrook*, 196 F.3d at 263. The employer will satisfy this burden by articulating any legitimate reason for its action, and when it does so, the presumption of discrimination or retaliation drops from the case. To prevail on her claims, the plaintiff must then satisfy the third step – to show both that the employer's articulated reason was false and that discrimination or retaliation was the real reason for the employer's action. *Holbrook*, 196 F.3d at 263; *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir.), *cert. denied*, 522 U.S. 914 (1997). While the burden of production shifts according to this framework, the plaintiff always has the ultimate burden of persuading the trier of fact that the defendant discriminated against her. *Burdine*, 450 U.S. at 253; *Carney v. American Univ.*, 151 F.3d 1090, 1093 (D.C. Cir. 1998).

To defeat a motion for summary judgment in a case subject to *McDonnell Douglas*, the plaintiff must raise a genuine issue of material fact with respect to each element of the *McDonnell Douglas* framework. *Carney*, 151 F.3d at 1093.

### III.    Argument

1.    The agency has articulated legitimate, non-discriminatory reasons for conducting the RIF.  The Plaintiff has failed to support her allegations of discriminatory or retaliatory animus with any proof.

In 2002, the Director of the OTS determined to conduct an agency-wide reduction-in-force because of "the Agency's ongoing budget deficits."  Riccobono Declaration, ROI at 115.  OTS's senior managers were directed to "come up with a staffing plan for the examination staff that would eliminate excess staff."  *Id.*  At the time, Plaintiff was employed as an Administrative Secretary II in OTS's Supervision Office, which was headed by Scott Albinson.  Albinson Declaration, ROI at 160. Albinson was Plaintiff's second-line supervisor.  *Id.*  After the head of the agency decided to reduce the number of employees, Albinson was delegated the task to identify which positions in the Supervision Office could be done away with without harming its effectiveness.  *Id.* at 162.  Albinson determined that the Administrative Secretary II position in the Supervision Office was "one that could be eliminated without harming office operations."  *Id.* at 163.  *See also* Rendleman Declaration, ROI at 325.[6]  Notably, when he made the decision to abolish Plaintiff's position, Albinson had no knowledge of her record of prior EEO activity.  Albinson Declaration, ROI at 161.

Albinson's decision to eliminate the Plaintiff's position in his office was done because the "[s]ecretarial position is often the one managers feel they can do without over other technical staff," because in contrast to earlier years, technology now allows many

---

[6]    Two hundred and six positions, or about 20% of the agency's workforce were eliminated in the 2002 RIF.  ROI at 329.  Plaintiff's position was one of four in the Supervision Office that were abolished.  Plaintiff was the only Administrative Secretary II in the competitive service that office.

professional employees to perform their own secretarial duties. *See* Rendleman

Declaration, ROI at 327. Plaintiff's position as an Administrative Secretary II in the

competitive service was not the only one identified for abolishment in the Washington,

D.C. headquarters of OTS in 2002. Two other Administrative Secretary II positions in

the competitive service in Washington, D.C. (out of a total of five) were also identified as

being excess. ROI at 69.

As is required by RIF regulations, the agency compiled a retention register of all

Administrative Secretaries II in the competitive service in Washington and ranked them

according to their service computation dates, the two most senior incumbents being

retained, and the three less senior incumbents being identified for release from service.

*Id. See generally* Janios Declaration, ROI at 171-77. Plaintiff ranked third of five, and

with only two Administrative Secretary II positions being retained by the agency, the

Plaintiff was therefore tentatively identified for release from federal service. ROI at 69.

As the next-most-senior Administrative Secretary II on the list had five years more

federal service than Plaintiff, Plaintiff's recent history of outstanding performance

reviews did not raise her computed service date beyond the third spot on the register. *Id.*

The agency then undertook a review of Plaintiff's employment record and the

agency's staffing data to determine if Plaintiff had rights to "bump" another more junior

employee or "retreat" into a position Plaintiff may have previously held, pursuant to the

RIF regulations found at 5 C.F.R. § 351.701. *See* Janios Declaration, ROI at 172-73. *See*

*also* Rendleman Declaration, ROI at 327. Plaintiff was ineligible to "bump" another

employee from his or her position in order to remain on the agency payroll. Plaintiff

"was in Tenure Group I, Subgroup B (Career employee – non-veteran)…. [Plaintiff] had

no bump rights since there were no employees in a lower Tenure and Subgroup (Tenure Group II or III – veteran or non-veteran) whom she could displace." *See* Janios Declaration, ROI at 172.[7] *See also* 5 C.F.R. § 351.701(b). Plaintiff was also ineligible to "retreat" to a position previously held in the federal service "since there were no employees with lower retention standing occupying positions that she held previously in her federal career." *Id. See also* Rendleman Declaration, ROI at 327; 5 C.F.R. § 351.701(c). Simply put, Plaintiff was properly subjected to the RIF.

In light of the foregoing uncontested facts, the Plaintiff has failed to identify a single witness or piece of documentary evidence which might show that her 2002 release from federal service was due to any impermissible discriminatory or retaliatory animus. Plaintiff admits that no racial, sexist, or ageist comments were made by anyone involved with the RIF. *See* Plaintiff's Deposition, Def. Ex. 8 at 66-68. Plaintiff admits that she has no witnesses who can testify that the RIF was a pretext for discrimination.[8] *Id.* at 28. Plaintiff's Complaint states that the "RIF was pretext; and, the Plaintiff intentionally

---

[7]    In her complaint, Plaintiff also spends a considerable amount of space naming other non-Administrative Secretary II employees and claiming that she was treated differently from them. *See* Complaint at 5-6. Plaintiff's recitation of names misses the mark. To prove that she was similarly situated to those other employees, Plaintiff must show that all of the relevant aspects of her employment situation were "nearly identical" to those employees. *Holbrook*, 196 F.3d at 261. *See also Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (GS-12 and GS-13 employees not similarly situated despite having common job functions). In Plaintiff's case, the only comparable employees are other Administrative Secretaries II serving in the competitive service in Washington, D.C., and as Defendant has demonstrated, the decision to eliminate three of those positions was based solely on budgetary and work-load needs, and not on any impermissible factors such as race, age, color, or sex.

[8]    For example, Defendant's plainly phrased Interrogatories required Plaintiff to identify witnesses who have information relevant to her claims. Her entire response was "Pro se, none at this time." *See* Def. Ex. 9 at 1 (Plaintiff's response to Defendant's first interrogatory).

targeted in an act of reprisal and continued discrimination," Complaint at 6, but the

Plaintiff's allegations are unsupported by anything other than her say-so.  At the

summary judgment stage, a plaintiff cannot merely assert that the employer's reasons are

untrue or unworthy of belief.  Rather, she must provide evidence to support her claims.

*Holbrook*, 196 F.3d at 263.  *See also Marshall v. Shalala*, 16 F. Supp. 2d 16, 19 (D.D.C.

1998), *aff'd* 1999 U.S. App. LEXIS 7352 (D.C. Cir. Mar. 2, 1999) (*per curiam*);  *Batson

v. Powell*, 912 F. Supp. 565, 578 (D.D.C. 1996).

It is well-settled that a plaintiff's conclusory allegations, unsupported by factual

evidence in the record, are insufficient to withstand summary judgment.  *District Intown

Properties, L.P. v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) (citing

*Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)).  In this case, Plaintiff has offered

nothing more than her own *ipse dixit* recitation of her history of alleged mistreatment at

the hands of OTS.  As Plaintiff has offered no evidence or testimony supporting her

claims, there is no way any jury could rationally find in her favor on any element of the

Complaint.  Summary judgment for Defendant is therefore appropriate.  *Anderson*, 477

U.S. at 252.

     2.     <u>Plaintiff's claim that the agency's eight-day "delay" in the submission of her
retirement package to OPM is not an adverse employment action for which
she may sue.</u>

Plaintiff's only other claim upon which she exhausted administrative remedies is

her assertion that "OTS intentionally delayed her retirement package to OPM."

Complaint at 4.  While the Complaint seems to suggest that the "delay" in submitting her

retirement package to OPM caused her to suffer a permanent 14% reduction in the

amount of her retirement annuity payment, *id.*, Plaintiff admitted in deposition that the

14% reduction in her annuity came about only because of federal regulations reducing annuity payments for employees who retire prior to the age of 55. *See* Plaintiff's Deposition, Def. Ex. 8 at 18, 49. *See also* n.1, *supra*.

In fact, there is no evidence that the agency took any improper steps with regard to Plaintiff's retirement package, much less intentionally "delayed" the submission of the package to OPM. As soon as Plaintiff was officially removed from the active rolls of the Defendant's payroll in late July 2002, her retirement package was promptly sent to OPM.

Plaintiff was notified of her RIF on May 6, 2002. ROI at 238. She was given 60+ days paid administrative leave prior to her RIF date to allow her to seek other employment. *See* Rendleman Declaration, ROI at 328. Plaintiff's RIF was not scheduled to take effect until July 26, 2002. *See* Thomas Declaration, ROI at 179. Plaintiff, along with about 30 other RIFed employees, opted to retire in lieu of being released from service. *Id.* However, the Plaintiff remained on the active payroll of OTS with full pay and benefits until July 26, 2002. Rendleman Declaration, ROI at 328. At any time prior to July 26 the RIF notice could have been cancelled. *See* Thomas Declaration, ROI at 179. *See also* Rendleman Declaration, ROI at 328. Plaintiff's RIF action became final on July 26, 2002, and, on August 8, the agency submitted Plaintiff's retirement paperwork to OPM. *See* Thomas Declaration, ROI at 179. The official responsible for submitting Plaintiff's retirement package to OPM was an African American female, age 49. *Id.* at 178. Plaintiff's package was "about the first" sent to OPM by the agency. *Id.* at 180. Since Plaintiff admits that her reduced annuity was not caused by this "delay," she suffered no "materially adverse consequences affecting the terms, conditions, or

privileges" of her employment.  *Currier v. Postmaster General*, 304 F.3d 87, 88 (D.C. Cir. 2002) (citing *Brown*, 199 F.3d at 457).[9]

### IV.     Conclusion

For the foregoing reasons, the Court should enter summary judgment in favor of the Defendant and the Plaintiff's case should be dismissed with prejudice.  A proposed order is submitted contemporaneously with this Memorandum.

Dated: March 21, 2008                          Respectfully submitted,

JOHN E. BOWMAN
Chief Counsel

DIRK S. ROBERTS
Deputy Chief Counsel

ELIZABETH R. MOORE
Special Counsel

/s/_____
CHRISTOPHER A. STERBENZ
Trial Attorney
Office of Thrift Supervision
1700 G Street, N.W.
Washington, D.C.  20552
Telephone (202) 906-6528
Fax (202) 906-6353
christopher.sterbenz@ots.treas.gov
D.C. Bar No. 437722

Attorneys for Henry Paulson,
Secretary
United States Department of the
Treasury

---

[9]     Even if Plaintiff could claim this brief "delay" was a materially adverse consequence affecting her employment, the Plaintiff has not shown any unlawful bias because her package was "about the first" sent to OPM.  *See* Thomas Declaration, ROI at 180.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 21, 2008, I served a copy of the foregoing

on the following by certified mail, return receipt requested:

>       Robin Olebara
>       P.O. Box 2530
>       Washington, DC  20013-2530


/s/_____
Christopher A. Sterbenz
Trial Attorney
Office of Thrift Supervision
1700 G Street, N.W.
Washington, D.C.  20552
Telephone (202) 906-6528
Fax (202) 906-6353
christopher.sterbenz@ots.treas.gov
D.C. Bar No. 437722

Investigative File

Equal Employment Opportunity Complaint

for

Robin Olebara

and

Kenneth Dam
Acting Secretary of the Treasury

TD Case Number: 02-2378TM

RECEIVED
DEC 24 2002



02-2378 T

Robin Olebara
Page 1 of 6

CERTIFIED MAIL ~ RETURNED RECEIPT REQUESTED (7002 0860 0007 9066 7279)

Thursday, August 15, 2002

Deborah Jenkins, Director
U.S. Department of Treasury
Treasury Complaint Center
Suite 640
800 K Street, N.W.
Washington, D.C. 20001-8000

Attention: Director Jenkins:

RECEIVED

AUG 2 9 2002

RECEIVED

AUG 3 0 2002

TREASURY COMPLAINT CENTER
DALLAS, TEXAS

In accordance with the enclosed instructions, I wish to file a formal complaint on matters of discrimination, retaliation and reprisal which have adversely impacted my equal employment opportunities, as a federal worker and a protected federal worker. The instructions that were provided may be (intentionally) inadequate and possibly incorrect, but, it would seem best to proceed, as directed.

I was hired at the then Federal Home Loan Bank Board (FHLBB) which was abolished under the Financial Institution Recovery, Reform Enforcement Act (FIRREA) and replaced by the Office of Thrift Supervision (OTS) as a bureau within the U.S. Department of Treasury. I was employed as a qualified Contract Specialist GS-1102-7 (in the career ladder) with promotion potential to GS-12. As a result of uniquely and craftily implemented personnel actions, I have been consistently demoted. And, on July 27, 2002, I was involuntarily retired (at a 14% reduction) as a TG-12 Secretary equivalent to a GS-8. My employment journey during this period has been wracked with questionable violations and discriminatory practices. This has been somehow sanctioned by OTS's use of FIRREA's exemptions to justify its means of systemic but unsystematic personnel practices. The OTS sways in and out of OPM's consciousness, in other words, "*catch me if you can!*"

My complaint alleges adverse, discriminatory and retaliatory actions, and, in a continuing pattern and practice by Treasury's OTS. In the past, I have presented other and similar claims and complaints of personnel violations within the EEO arena and the union grievance procedures [FMCS Case No 92-28112, EEOC No. 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; and, Case No. 00CV 02374(JR)]. In the

Robin Olebara
Page 2 of 6

latter, the jurist called me a veteran complainer. It seems more likely that the system failed, I was betrayed and was justice denied. The proper description should have been, the OTS seems to be a veteran discriminator, their motto, *"we make the rules, as we go along, we do our will!"*

I am a 48-year old, dark-complexion African-American female. Years ago, I was told because of my race and dark complexion, I would not progress at the agency (i.e., advance/receive equal employment opportunities provided to others, especially whites and white complexion African Americans.) Not only have I been continually and consistently denied advancement as similarly situated employees, I have been adversely affected, negatively impacted, targeted, demoted and placed at risk. None of this is the result of poor, lacking or failed performance on my part. Therefore the only other reasonable conclusion would be personnel violations.

My complaint contends the following:

In November 2001 during the pre-trial conference, the judge delayed the trial. The next month (December 2001), after the postponed scheduled trial date, the presiding judge accepted the agency' late submission of a summary judgment and refused to allow my case to be presented for a jury trial. I contend this action was an authoritative endorsement for further actions against me by the OTS.

Separately in December 2001, a former OTS manager provided a deposition for another employee in a complaint of discrimination, in which she sated OTS white managers had decided African-Americans employees were at the ceiling, their maximum potential earnings at the OTS. Afterwards and as a result of her deposition, in unusual move, the OTS non-competitively promoted many African-Americans to dispel those facts which supported the statement. The promotions were a surprise to both the promoted employees and without the knowledge of many of their immediate supervisors. Not to be outdone, it was an opportunity for whites employees to be similarly promoted (white employment advancement in not unusual, it's the generally accepted rule.) Historically OTS's actions may not always be limited to either/or, but, the possibility of multi-faceted/comprehensive reasoning, such as the preparation for the potential RIF status. So during this period, the OTS seemed to take the opportunity, to control the RIF

Robin Olebara
Page 3 of 6

affects by promoting, reassigning and otherwise changing staff from harm's way for its planned reduction-in-force scheduled to take place in May 2001 (Faith Davis, Scott Schwartz, Randy??, Cheryl Wright, Joseph Thornton).  Since many of these actions were non-competitive and not always announced (stealth in nature), it is difficult to provide a full accounting of the personnel changes which occurred from December 2001 to present.  It's my understanding, a recent reorganization listing was released Monday, July 29, 2002, but, for changes which occurred during the RIF period.

In preparation for the (Headquarters) RIF, the results did not affect staff who may have mismanaged, or, staff who's functions and tasks may have been duplicative, or, cost cutting measures.  The RIF affects seemed as an opportunity to fire and displace staff (bargaining unit and non-bargaining unit) who are not liked, un-liked and disliked for any particular reason (Olebara, Jenkins, a female attorney, a male attorney).  There were also staff used as possible pawns cloaked/deception (St. Louis, Goddard, Carter, Beverly?); and, then the typical lower-graded clerical African-American females used to balance the budget.

In addition to the specific attacks, and, in an attempt to cause maximum harm, the OTS changed its usual RIF policies (at headquarters); they also ignored OPM's RIF guidance, when it did not consider and eliminated the:

- voluntary separation (early outs), or, incentives;
- buy-outs or incentives to the targeted groups (just get-out),
    Note:  Knowing OTS's history and behavior, its possible buy-outs or other guises of payments may have been disbursed some employees (Rudder, et al); and,
- save-pay/pay retention (for an employee who bumped or retreated)
    Note:  This may have been uniquely applied to me, if I prevail during this matter, besides, Deborah Goddard, its unclear how many other employees were bumped/retreated.

These changes are questionable at best, considering the reasoning for the RIF.  How many employees would have considered an early-out incentive?  As for the so-called hard decisions, a

Robin Olebara
Page 4 of 6

follow-up memorandum to "All OTS Staff" dated April 11, 2002 with the exception of the OTS reorganization, James Gilleran wrote "normal promotions and salary increases" will not be held up. And if budget problems have existed since 1998, consider the hires and promotions during this time (James Harden, et al) During this period, Scott Albinson received a one-time, non-competitive promotion to Managing Director, and it's rumored a $50,000.00 (the increase alone is an annum salary for many). Then factor his annual merit increases, other bonuses and awards; and, the banking institutions which failed on his watch?

It's my contention, I was intentional targeted because of my race, sex, age and prior EEO and grievance involvement.

The position I held as Administrative Secretary, Compliance Policy was eliminated. However, the unit and function of that office exists; and, the secretarial support is needed. As a result, Ann Timbers (white female) with less seniority was protected. During an early RIF she was similarly treated.

A brief glance at the copied retention register, for the CSRS employees, I'm placed at third position, behind two other white females. So conveniently, myself and the remaining two (African American females) were targeted even though each of us worked with larger staff on a daily basis. Someone stated, all of the TG-12 secretarial positions were eliminated. More correctly, only the Black, CSRS, TG-12 secretaries were eliminated; or, all of the Black, CSRS, TG-12 secretaries were eliminated; and, no white, CSRS/Schedule A, TG-12 secretary was eliminated.

Ann Timbers TG-12 secretary (white female) worked and supported the least number of staff and possibly received the (highest salary) and least seniority of TG-12 African American secretaries (CSRS and Schedule A), but was protected at a time when hard decisions were supposedly required. The decisions do not seem hard or difficult, but, more likely racially-motivated, retaliatory employed and quite easily applied and sanctioned.

Robin Olebara
Page 5 of 6

By OPM's RIF policy and regulations I should have had bump and retreat rights to the position held by Miriam Neale (Procurement Assistant). After Sue Rendlemen handed me, the RIF package, I asked her about my RIF rights. She referred me to Marie Janios. I stopped by Marie's office and received a secretarial retention notice, during that time, Marie told me, I did not have no bump and retreat rights because there was no one hired in the last three years, whom I could bump. Yet Deborah Goddard (white female) bumped (Beecher) conveniently into her same grade and displaced an employee who has been on-board for more than three years.

With the questionable personnel opportunities provided to Terri Radcliff's (position-type) and Faith Davis's promotion, (both white females) it's possible I should have had potential RIF rights, as well.

In another unusual action against me, OTS willfully and intentionally delayed submitting my involuntary retirement package to OPM. As late as last week, on Wednesday, August 7 Sandy Thomas (Personnel) told me, she intended to get my paperwork mailed to OPM that week. I asked when? She replied, possibly tomorrow. I submitted the completed package to her in early June. It is their intent to cause as much career and financial hardship to me, within their power. Without the career equal employment opportunities afforded to others; and, the penalty for early out, it seems to be a willful and destructive mechanism for abject poverty while others flourish in all sorts of manner, including non-competitively.

Other interesting matters related to this RIF process:

It was rumored a reorganization of some offices and personnel would take place after the RIF, in particular TG-12 secretaries would be re-assigned and promoted (an after RIF correction/adjustment.)

OTS stated the RIF was the result of mismanagement and the lost revenue from savings institutions. There have also been failed institutions and successful legal challenges against OTS by institutions. But, those of us targeted for the RIF were not the responsible managers or

Robin Olebara
Page 6 of 6

decision makers. It's rumored none of those responsible managers and decision makers were targeted during this RIF.

Its rumored there was only one white male on the RIF list for bargaining unit employees. I do not know his name, he's identified as an attorney. Another (male) attorney left the agency in the midst of the RIF announcements, and, as a result, the only white male on the RIF list was removed and his position saved. There have been other non-targeted employees, who have departed during the RIF process, but, similar offers were not presented to targeted RIF employees.

On August 3, I signed for a certified envelope from OTS which included a letter and three enclosures "Notice of Rights", "Privacy Act Notice", and Notice of Right to File a Discrimination Complaint Under 29 CFR Part 1614, copy of each enclosed. You will notice errors (as penned) and possible questionable practice. Besides, extensive banking newspaper coverage, its rumored OTS has received a record number of EEO inquiries/complaints, and, a visit from the Office of Special Counsel investigations related to the recently implemented RIF. Thus, potentially providing incorrect filing instructions; and, misinformation is problematic for legal processing and filing deadlines, but, as stated many times over, this has been their practice and pattern.

Sincerely,

Robin Olebara
Post Office Box 2530
Washington, D.C. 20013

(202) 269-3683

Enclosure:    As stated herein; and, copied
              E-mail to EEO Director dated June 12, 2002 (4 pages)
              Individual Employment Record (2 pages)
              SF-50 (2 pages)
              Memorandum "All OTS Staff" dated April 11, 2002 (2 pages)

**TO:**    **Lynnwood Campbell**
Director, Office of Equality
And Workplace Principles
202-906-5713
l.Campbell@ots.treas.gov

**FROM:**    **Marianne Graves,**
EEO Counselor
Office of Thrift Supervision
1700 G Street, NW
Washington, DC 20552
202-906-6279
Marianne.graves@ots.treas.gov

**SUBJECT:**    **Robin Olebara, Complainant**
P. O. Box 2530
Washington, DC 20013-2530
Telephone #: Not Available
Administrative Secretary II 318-12

# EEO Counselor's Report
Prepared August 20, 2002

### Chronology of Events

**6/12/02**
Ms. Robin Olebara contacted Mr. Lynnwood Campbell, Director, OEWP.

**6/14/02**
*(Attachment 1- e-mail)*
Mr. Campbell sent Ms. Olebara an e-mail stating that he left several voice messages and to contact Marianne Graves, EEO Counselor.

**6/24/02**
*(Attachment 2 - e-mail)*
Mr. Campbell sent Ms. Olebara an e-mail stating that we have not heard from her. She responded on 6/28 stating that she intends to pursue a formal EEO complaint.

**6/26/02 - 10:55 a.m.**
I received a voice mail from Ms. Robin Olebara requesting a counseling appointment. She stated that Mr. Lynnwood Campbell, Director, OEWP, recommended that she call me.



**6/27/02**
I spoke with Ms. Olebara on the telephone and agreed to meet on Friday, June 28, 2002, at 12:30p.m.

**6/28/02 – 12:30 p.m.**
*(Attachment 3 - written complaint)*
Ms. Olebara and I met in my office. She gave me her complaint in writing.

Ms. Olebara said she wished to file an EEO complaint on the RIF action she received from OTS. She contended that she is being discriminated against because of her race, and age and retaliated because of her prior grievance complaint.

Following are some comments Ms. Olebara made during our meeting:

(1) Ms. Olebara continually questioned why she did not receive "bump and retreat rights" and said she had information on some employees who did have those rights.

(2) Ms. Olebara stated that it's been a continuing pattern and practice of the agency to intentionally humiliate, discriminate and retaliate against her for her previous EEO complaint.

(3) Ms. Olebara said she had not been able to look for a job because she has been under tremendous stress since she was riffed.

I asked Ms. Olebara what it would take to resolve her complaint. She stated: "To go to court and get a jury award".

**7/18/02**
*(Attachment 4 – e-mails)*
I received an e-mail from Ms. Olebara in which she attached three e-mails. She stated that these e-mails suggest secretarial support functions are needed in her former office.

**7/22/02 – 1:00 p.m.**
I received a voice mail from Ms. Olebara stating that she has officially left OTS. She checked out Friday, 7/19/02 and no longer has access to e-mail. Ms. Olebara said her voice mail is still on and she would check for messages. I left her a voice message asking if she has another address beside the P.O. Box because I needed to send her certified mail. I also told her I did not have a telephone # for her and would she please leave me one on my voice mail.

**7/25/02 – 7:20 a.m.**
Ms. Olebara left a message on my voice mail stating that she can receive certified mail at the PO address. She did not address my request for a telephone # or address.

**7/25/02**
*(Attachment 5 - letter)*

10

I sent Ms. Olebara a registered letter containing 1) Notice of Rights; 2) Privacy Act Notice; 3) and Notice of Right to File a Discrimination Complaint.

**8/6/02**
*(Attachment 6 - e-mail)*
Mr. Campbell sent an e-mail to Ms. Rendleman, HR requesting a telephone number or address for Ms. Olebara.

I telephoned Ms. Maria Janios, HR and requested any information she could give me that relates to Ms. Olebara.. Ms. Janios said that Ms. Olebara came to her office and she gave her a copy of her "Individual Employment Record". Ms. Janios told her that she did not have "bump and retreat" rights and offered to discuss it with her. Ms. Janios said Ms. Olebara took the form and walked out and has not contacted anyone in HR.

Ms. Janios will give me a copy of the form she gave to Ms. Olebara.

**8/9/02**
*(Attachment 7 - receipt)*
Received receipt for certified package I sent to Ms. Olebara. The receipt is dated 8/3/02.

**8/9/02**
I spoke with Sue Rendleman, Director, HR.   Ms. Rendleman said Ms. Olebara did not request assistance in finding employment prior to her final departure. However, HR would be willing to assist Ms. Olebara in finding employment. Ms. Rendleman stated that Ms. Olebara was not riffed as a result of any retaliatory actions from any prior complaints filed against the agency.

**8/14/02**
*(Attachment 8 - HR Form)*
I received the "Individual Employment Record" form from Maria Janios.   There is a note on the form stating: "No bump or retreat. Never held an 1106 position so she can't retreat into it."

**8/19/02**
*(Attachment 9 – Signed Form)*
I received the signed copy of the "Notice of Right To File A Discrimination Complaint…" via mail from Ms. Olebara. The Notice was signed 8/3/02. Ms. Olebara wrote a note on the original letter and dated it 8/9/02. The postmark on the envelope is dated 8/12/02.

11



DEPARTMENT OF THE TREASURY
TREASURY COMPLAINT CENTER
1301 CLAY STREET, SUITE 1020N
OAKLAND, CA 94612
(510) 637-3100

Robin Olebara
Post Office Box 2530
Washington, D.C.  20013-2530

OCT 08 2002

Complaint of Robin Olebara and
Paul H. O'Neill, Secretary of the Treasury
TD Case Number:  02-2378TM

Dear Ms. Olebara:

This letter refers to the above referenced complaint of discrimination filed on
August 15, 2002.

Based on our review of the formal complaint, the EEO Counseling Report, and your
response of September 30, 2002 to our clarification letter of September 17, 2002, the
complaint is accepted for processing under the provisions of the Equal Employment
Opportunity Commission (EEOC) regulations, 29 CFR Part 1614.  The issues to be
investigated are:

> Whether the Complainant was discriminated against on the basis of her
> race (African American), color (dark complexioned), sex (female), age (48)
> and/or in retaliation for prior EEO activity when the agency terminated her
> employment from the position of Secretary, TG-12, effective July 27,
> 2002, as a result of a reduction in force (RIF).

> Whether the Complainant was discriminated against on the basis of her
> race, color, sex, age, and/or in retaliation for prior EEO activity when the
> agency delayed submitting her retirement package to the Office of
> Personnel Management (OPM).

> Whether the Complainant was discriminated against on the basis of her
> race, color, sex, age, and/or in retaliation for prior EEO activity when, after
> her termination was effected, she was not later offered the position
> vacated by a white male employee (amendment filed on October 1, 2002).

If you disagree with the issues, please notify me in writing within 15 days of the date of
this letter.  Please be clear and concise in your response.  If no response is received, I
will assume that you agree with the issues and will proceed with the investigation of the
complaint.

(32)

2

An EEO Investigator will be assigned to thoroughly investigate all aspects of the issues accepted for processing. The investigator has the authority to administer oaths and to require employees to furnish affidavits under oath or affirmation without a promise of confidentiality or, alternatively, by written statements under penalty of perjury. The complainant has a responsibility to cooperate with the investigator in timely scheduling an appointment, meeting with the investigator and providing necessary written statements. Failure to do so may result in the dismissal of the complaint for failure to cooperate.

Any affidavit, written statement, or documentary evidence submitted to the EEO Investigator is subject to prohibitions against improper disclosures. All parties who provide statements or documentary evidence bear the responsibility to ensure that the submissions are properly sanitized, and should consult with bureau disclosure officials if there are any questions concerning what material would constitute disclosure.

In accordance with §1614.603 of the regulations, the parties must make reasonable efforts to voluntarily settle the complaint throughout the process. The terms of any settlement agreement will be reduced to writing, and you will be given a copy.

Because the EEO complaint involves a matter which is also appealable to the Merit Systems Protection Board (MSPB), it is considered a mixed case complaint as defined in §1614.302(a). Upon completion of the investigation, you will be furnished a copy of the Investigative File and a notice advising you that the Department of the Treasury will issue a final agency decision without an EEOC hearing within 45 days.

After receiving the Department's final decision on the complaint, you have the right to appeal it to the MSPB within 30 days of receipt of the decision, or you may file a civil action with the appropriate federal district court within 30 days of receipt of the decision.

You are advised that since the complaint is considered a mixed case complaint, if a final agency decision is not received from the Department within the earlier of 180 days after the amendment or 360 days of the filing of the original complaint, you have the right to file an appeal with the MSPB or file a civil action in federal district court. These rights are further specified in 5 CFR §1201.154 and 29 CFR §1614.310.

You raised additional questions both in your complaint and response to our clarification letter of September 30, 2002. You first allege that instructions that were provided by the EEO office were, perhaps intentionally, inadequate and possibly incorrect. Please inform us whether you would like to pursue this as a complaint against the complaint process. If that is the case, we will forward that complaint to the Office of Equal Opportunity Program, the office responsible for the quality of complaints processing.

You also inquired as to why your complaint is being handled by the Treasury Complaint Center, Oakland. The Treasury Complaint Center, Washington, D.C., will close in

33

2

October 2003. In anticipation of that closure, all incoming complaints are being handled, on a rotational basis, by the other three Complaints Centers, Dallas, Chicago and Oakland.

You also asked why the Treasury Complaint Center, Oakland, questioned the timeliness of your complaint. We did so because the postmarked date on your envelope to the Treasury Complaint Center, Washington, D.C. was unclear although their post office stamped it as received on August 29, 2002. We, thus, asked you to clarify the postmarked date, which you did.

If you have any further questions regarding the processing of your complaint, please contact EEO Specialist Karen Seddio at (510) 637-3186.

Sincerely,

Lois Hofmann
Director

34

48

```
RUN DATE: 05/01/2002
RUN TIME: 07:14:54
PAY PERIOD: 10
PAY PERIOD DATES: 04/21/2002 - 05/04/2002
```

OFFICE OF THRIFT SUPERVISION
PAYROLL/PERSONNEL SYSTEM
REPORT: OTS RETENTION REGISTER
USER: PERSONNEL

REPORT #: ASYQ30_WD
PAGE: 5
ALL AGENCY EMPLOYEES

FULL TIME   -   COMPETITIVE SERVICE(1)
COMP AREA   : 0000 - WASHINGTON, DC
GRADE       : 12
COMP LEVEL  : 05

| OFFICE | TENURE | VET PREF | EMPLOYEE NAME | JOB CODE AND TITLE | ACTUAL RIF-SCD | 4 TH APPR | PERF-APP | COMPUTED SERVICE |
|---|---|---|---|---|---|---|---|---|
| 10000 | 1 | B | HURWITZ, EVELYN S | 005908 ADMINISTRATIVE SECRETARY II | 06/27/1961 04 | 16 + 16 +12 = 44 | | 06/27/1946 |
| 27000 | 1 | B | WOODS, NORMA J | 005908 ADMINISTRATIVE SECRETARY II | 04/30/1969 05 | 20 + 20 +20 = 60 | | 04/30/1949 |
| 66600 | 1 | B | OLSBARA, ROBIN C | 005908 ADMINISTRATIVE SECRETARY I | 07/06/1974 05 | 20 + 20 +20 = 60 | | 07/06/1954 |
| 33000 | 1 | B | FORD NORRIS, BEVERLY C | 005908 ADMINISTRATIVE SECRETARY II | 07/10/1972 04 | 12 + 16 +16 = 44 | | 07/10/1957 |
| 32000 | 1 | B | CAPUER, PATRICIA D | 005908 ADMINISTRATIVE SECRETARY II | 04/17/1973 06 | 16 + 16 +16 = 48 | | 04/17/1957 |

Note:

(*) - ASSIGNED FULLY SUCCESSFUL, no performance rating on file.

(#) - ASSIGNED FULLY SUCCESSFUL, performance rating of (9) on file.

*Retention Register*

55



**SUBJECT:** Discrimination Complaint of Robin Olebara and Paul H. O'Neill, Secretary of the Treasury, TD Case Number: 02-2378TM

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the following provisions of 28 U.S.C. 1746, I, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

**1. Please state your name, title, series and grade, duty location, race, sex, age, and your prior EEO activity (i.e. witness, complainant, management official, etc)**

My name is Richard M. Riccobono. I am the Deputy Director of the Agency. I hold a TG-301-30 position in Washington, DC. I am a male Caucasian over the age of 40. My only involvement in the EEO process has been as a management official in connection with the large scale RIF that the Agency had to undertake in 2002, which resulted in the loss of over 200 jobs, or approximately 20% of the workforce.

**2. Provide a brief description of your current professional role with the agency. State how long you have been in your current position, and profile your span of supervision.**

I am the Deputy Director, and I report to the head (Director) of the Agency. I have held this position since May 1998. Prior to that I was the Deputy Regional Director and Acting Regional Director in the Agency's Southeast Regional office, located in Atlanta, Georgia. I have held a number of progressively more responsible management positions with the Agency since joining it in 1989.

The attached organization chart depicts the span of my supervision. I supervise the examination, supervision, legal and administrative functions of the Agency.

**3. Did you know the Complainant personally? Were you aware of her race, color, gender, age and prior EEO activity?**

I did not know Ms. Olebara personally, although I know who she is because she worked in the Washington office. I am aware of her race, color and gender, but have no knowledge of her age. I am aware of one prior EEO complaint filed by Ms. Olebara. Several years ago, I met with Ms. Olebara and her attorney and attempted to negotiate a settlement of her EEO complaint.

**4. Please state what your role was in the realignment decision-making process?**

By "realignment," I assume you mean the realignment of the Agency's Regional offices in 2002. That realignment resulted in the elimination of our former Central Region, based in Chicago, Illinois and redistribution of the workload of that Region to the other four Regional offices located in Jersey City, NJ (Northeast); Atlanta, GA (Southeast); Dallas, TX (Midwest); and Daly

Page 1 of 6



City, CA (West).

I made the recommendation to the Director that we realign the Regional offices as part of a comprehensive plan to fulfill his mandate to reduce our severe and ongoing budget deficits. He accepted that recommendation and directed me to implement that decision. I relied upon subordinate staff, including the Regional Directors and the Director of Human Resources, to bring the realignment to completion.

**5. Please describe specifically all the events that occurred leading up to the decision to restructure. State the names and titles of individuals who were involved in those events.**

By "restructure" I assume that you mean the Agency's 2002 reduction in force (RIF) that resulted in the elimination of over 200 positions or approximately 20% of the Agency workforce. The Director (James E. Gilleran) was appointed by the President to head this Agency in December 2001. Based upon his extensive background in business, public service and accounting, he was very concerned about the Agency's ongoing budget deficits (totaling approximately $25 million over the past three years). One of his early decisions directed me to balance the Agency's budget to stabilize the Agency's precarious financial condition. I believe he gave me this assignment in mid-January 2002. Because most of the Agency's budget goes to personnel expenses, the Director authorized a RIF and a realignment of the Regions in order to balance the budget.

**6. After the decision was made to restructure, please state your role in the process to ensure that the restructuring took place.**

I convened a high level staff meeting in Washington in mid-February, 2002 to announce the RIF and realignment of the Regions. To the best of my recall, the meeting was attended by myself, my assistant (Bill Casey), the Managing Director for Supervision (Scott Albinson), his assistant (Lori Quigley), the CFO/CIO (Tim Ward), the Chief Counsel (Carolyn Buck), the Director of Human Resources (Sue Rendleman), West Regional Director (Charles Deardorff), his Deputy for Administration (Janice Roudebush), Midwest Regional Director (Fred Casteel), his Deputy for Administration (Dennis Havener), Southeast Regional Director (John Ryan), his Deputy for Administration (Maria Richmond), Northeast Regional Director (Robert Albanese), and his Deputy for Administration (Walter Windish). At that time, John Ryan also served as the Acting Central Regional Director. I believe that Dan McKee, Acting Central Region Director and Nancy Segal the Central Region Deputy for Administration also attended this meeting.

At that meeting I announced that the Director had determined to conduct a RIF and realignment of the Regions. We announced a major policy decision to merge or "meld" the previously separate compliance examiners and safety and soundness examiners. The Regional Directors were told to work with me to come up with a staffing plan for the examination staff that would eliminate excess staff, yet allow the Agency to meet a realistic budget and continue to ensure the safety and soundness of the thrift industry. The Regional Directors were informed that most administrative functions would be centralized in Washington. They were also told of the

Page 2 of 6



115

decision to contract from five to four Regional offices.

I delegated to my Director of Human Resources (Sue Rendleman) the responsibility to carry out the details of the RIF. I received periodic feedback from the Regional Directors and the Director of Human Resources regarding the progress of the RIF and regional realignment.

**7. Please describe the OTS restructuring in detail. Describe the organization before the restructuring and then describe the "restructured" organization.**

Please request the Agency's Human Resources office to provide an organizational chart before the restructuring. The attachments including the current organization chart and the April 11, 2002 announcements from Director Gilleran provide the best description of the restructuring. See also my responses to questions numbered 4, 6 and 8.

**8. According to the April 11, 2002 memorandum, OTS was consolidating certain administrative functions into Washington that were previously duplicated in the region; i.e. human resources, budgeting, accounting and procurement. What impact did this have on headquarters and field offices? Were any positions or functions eliminated? Who made these decisions?**

The consolidation of administrative functions resulted in the elimination of most administrative positions in the Regions. Concomitantly, it increased the workload of administrative staff in Washington, DC. Positions and functions were eliminated in the Regional offices in connection with the decision that I made to consolidate these functions. I worked with the Regions to develop a consistent model to use for Regional staffing of the administrative functions.

**9. Please describe the regional realignment in detail as proposed by the April 11, 2002 memorandum (5 regions to 4 regions). Please describe the changes in each region.**

I do not have any additional information other than provided in 7 and 8 above and the attachments, particularly the April 11th memorandum. As a general matter, the Agency is working with 20% less human resources.

**10. Please provide a list of employees who were on the OTS rolls by position, grade, series and location before the restructuring.**

Please see Human Resources for this detailed information.

**11. Please provide a list of employees who are currently on the OTS rolls by position, grade, series and location after the restructuring.**

Please see Human Resources for this detailed information.

**12. Are there any further plans for restructuring? Are there other employees who would**

Page 3 of 6



**be affected in the future, based on this restructuring?**

There are no plans for restructuring and RIFs at this time. However, any unexpected changes in the Agency's budget situation could result in future RIFs and restructuring. It should be noted that this Agency has been periodically downsizing since it was created in 1989. It should be noted that OTS derives most of its revenue from assessments on the industry it regulates; consequently OTS's revenue is dependent on industry assets.

**13. Please describe a Reduction in Force (RIF) and the entire process. What factors exist before a RIF can be put in place? Who is authorized to initiate a RIF?**

I do not have the detailed knowledge of personnel rules to answer the first two subparts of this question. Please obtain this information from the Director of Human Resources. At OTS, the Director and I are authorized to initiate a RIF.

**14. Please provide all documentation pertaining to the restructuring and the RIF process.**

See the attachments, including the 2000 and 2001 financial reports, as well as the pro forma 2002 budget information. These attachments document the Agency's budget deficits for 2000 through 2002. I have no other documentation.

**15. What were the factors in deciding that the Complainant would be affected by the RIF?**

I do not have the detailed knowledge of this individual's situation. There were over 200 positions eliminated in this RIF, and I am not familiar with each of the 200 positions that were subject to the RIF. However, practically all units in the Agency had to reduce staff due to the severe budget problem.

**16. Please respond to all relevant allegations raised by the Complainant. The Complainant alleges the following:**

   a.   **The Complainant states she was discriminated against on the basis of race, color, gender, age and retaliation for prior EEO activity when after her termination, she was not later offered the position of Contract Specialist that was filled by an employee outside of OTS.**

The premise of this allegation is incorrect. The Agency is in a downsizing mode and has been reducing staff. The Agency has not hired a Contracting Specialist.

   b.   **The Complainant alleges that OTS willfully and intentionally delayed submitting her retirement package to OPM that she completed in June, 2002.**

I do not have knowledge of detailed personnel matters. Please submit this question to the

Page 4 of 6



117

Director of Human Resources. That office is responsible for retirement matters.

   c.    **The Complainant claims that all African-American females were terminated by the RIF, and no White Schedule A, TG-12 secretaries were affected.**

The premise of this allegation is incorrect; the Agency absolutely did <u>not</u> terminate all African-American females in the RIF. I work with a number of African-American females at the Agency every day, including my secretary and the Director's secretary.

I do not have the detailed knowledge necessary to address the second part of this allegation regarding grade 12 Caucasian secretaries. Please submit this question to the Director of Human Resources.

   d.    **The Complainant states that her position of Administrative Secretary was eliminated, however the unit and function of that office still exists. As a result, a White, Female with less seniority was protected.**

It is correct that Ms. Olebara's secretarial position was eliminated in the RIF. A number of secretarial positions throughout the Agency were eliminated in the RIF because we could no longer afford to support those positions in the face of severe budget deficits. It is also correct that her former unit (Compliance Policy) and the function of that unit continue to exist, although it had been downsized. I do not specifically know how Compliance Policy is performing its secretarial work, but I believe, like other units that lost secretarial positions, the remaining secretarial and professional staff are absorbing that workload.

I do not have the detailed knowledge necessary to address the second sentence of this allegation. Please submit this question to the Director of Human Resources.

**17. Do you have anything else to add?**

At the beginning of this RIF and restructuring, I informed my subordinates that the downsizing was to be conducted in accordance with all applicable laws, rules and regulations.

As an Italian-American growing up in the 1960s in New York, I unfortunately know first-hand how ugly discrimination can be. I find discrimination repugnant, and I am personally and professionally opposed to discrimination in any manner.





I declare under penalty that the foregoing is true and correct.

Executed on _Dec. 9th, 2002_ at __Washington, DC_____
             (Date)                  (City/State)

Signature: _Richard M. Riccobono_____

Name: _Richard M. Riccobono_____

Title: _Deputy Director_____

Address: __Office of Thrift Supervision_____

        __1700 G Street, NW_____

        __Washington, DC  20552_____

        _____

(106)

# 2000
# Financial Report



# Office of Thrift
# Supervision

# Table of Contents

Page

- **Independent Auditors' Report** _____ **1**

- **Financial Statements** _____ **2**

- **Notes to Financial Statements** _____ **5**

- **Independent Auditors' Report on
  Internal Control** _____ **14**

- **Independent Auditors' Report on Compliance
  with Laws and Regulations** _____ **16**

# Deva & Associates, P.C.

Two Democracy Plaza · Suite 920 · 6707 Democracy Boulevard · Bethesda, MD 20817
(301) 897-9090 · FAX (301) 897-9133

## INDEPENDENT AUDITORS' REPORT

To the Inspector General,
U.S. Department of the Treasury

We have audited the accompanying statements of financial position of the U.S. Department of the Treasury, Office of Thrift Supervision (OTS) as of December 31, 2000 and 1999, and the related statements of operations and changes in net position, and cash flows for the years then ended. These financial statements are the responsibility of OTS' management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards; and *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of OTS as of December 31, 2000 and 1999, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

In accordance with *Government Auditing Standards*, we have also issued a report dated March 30, 2001 on our consideration of OTS' internal control and a report dated March 30, 2001 on its compliance with laws and regulations.

*Deva & Associates P.c*

Certified Public Accountants

March 30, 2001



127

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION
STATEMENTS OF FINANCIAL POSITION
(In thousands)

| | As of December 31 | |
| --- | --- | --- |
| | 2000 | 1999 |
| **Assets** | | |
| Cash and cash equivalents (Note 3) | $ 28,415 | $ 18,707 |
| Accrued interest receivable | 1,659 | 1,368 |
| Accounts receivable | 883 | 863 |
| Investments held to maturity (Note 4) | 87,224 | 108,703 |
| Property and equipment, net (Note 5) | 38,215 | 37,160 |
| Other assets (Note 11) | 1,859 | 1,887 |
| **Total Assets** | $ 158,255 | $ 168,688 |
| **Liabilities and Net Position** | | |
| **Liabilities:** | | |
| Accounts payable | $ 862 | $ 1,093 |
| Accrued annual leave | 8,869 | 8,972 |
| Workers' compensation liability (Note 6) | 5,623 | 4,493 |
| Deferred compensation liability (Note 11) | 983 | 954 |
| Deferred rent credit | 2,286 | 2,478 |
| Post-retirement benefit liability (Note 8) | 9,269 | 8,240 |
| Other accrued liabilities (Note 7) | 10,549 | 9,571 |
| **Total Liabilities** | $ 38,441 | $ 35,801 |
| **Net Position:** | | |
| Assumed capital (Note 2) | $ 41,037 | $ 41,037 |
| Retained earnings | 78,777 | 91,850 |
| **Total Net Position** | $ 119,814 | $ 132,887 |
| **Total Liabilities and Net Position** | $ 158,255 | $ 168,688 |

*The accompanying notes are an integral part of these financial statements.*

2

115

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION
STATEMENTS OF OPERATIONS AND CHANGES IN NET POSITION
Years Ended December 31
(In thousands)

| | 2000 | 1999 |
|---|---|---|
| **Revenues** | | |
| Industry assessments | $ 127,171 | $ 125,264 |
| Examination, application, and security filing fees | 4,153 | 6,710 |
| Interest | 7,764 | 7,687 |
| Rental income (Note 9) | 2,793 | 2,686 |
| Other | 2,027 | 1,366 |
| Total Revenues | $ 143,908 | $ 143,713 |
| **Expenses** | | |
| Personnel compensation | $ 92,938 | $ 90,667 |
| Benefits | 25,145 | 26,748 |
| Rent, communication, and utilities | 8,358 | 7,735 |
| Travel and transportation | 12,255 | 12,263 |
| Services | 5,160 | 4,804 |
| Data processing | 4,893 | 3,692 |
| Building expenditures | 3,581 | 3,889 |
| Office equipment and software | 1,658 | 1,704 |
| Miscellaneous | 1,088 | 943 |
| Depreciation | 1,905 | 1,264 |
| Total Expenses | $ 156,981 | $ 153,709 |
| **Excess of Expenses over Revenues** | $ (13,073) | $ (9,996) |
| **Net Position, Beginning Balance** | 132,887 | 142,883 |
| **Net Position, Ending Balance** | $ 119,814 | $ 132,887 |

*The accompanying notes are an integral part of these financial statements.*

3



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION
STATEMENTS OF CASH FLOWS
Years Ended December 31
(In thousands)

|  | 2000 | 1999 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Excess of Expenses over Revenues | $ (13,073) | $ (9,996) |
| Adjustments to reconcile excess of Expenses over Revenues to net cash provided by operating activities: | | |
| Amortization of net bond premium | 1,479 | 1,661 |
| Depreciation | 1,905 | 1,264 |
| **Changes in assets and liabilities:** | | |
| Decrease (increase) in receivables | (311) | 180 |
| Decrease in other assets | 28 | 3,104 |
| Decrease in accounts payable | (231) | (300) |
| Increase in other liabilities | 2,871 | 2,330 |
| Net cash used in operating activities | $ (7,332) | $ (1,757) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of investments | $ 0 | $ (44,648) |
| Maturities of investments | 20,000 | 29,624 |
| Purchases of equipment | (2,960) | (81) |
| Net cash provided by (used in) investing activities | $ 17,040 | $ (15,105) |
| Net cash provided by (used in) operating and investing activities | $ 9,708 | $ (16,862) |
| Cash and cash equivalents, beginning of year | 18,707 | 35,569 |
| Cash and cash equivalents, end of year | $ 28,415 | $ 18,707 |

*The accompanying notes are an integral part of these financial statements.*

4



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

## 1. REPORTING ENTITY

The Office of Thrift Supervision (OTS) was created when the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) abolished the Federal Home Loan Bank Board (FHLBB) and transferred all examination and supervisory activities to OTS under the Department of the Treasury. The primary functions of OTS are to: (1) charter federal savings and loan associations; (2) adopt regulations governing the operation of the thrift industry; (3) conduct examinations of federal and state chartered savings institutions and their holding companies; and (4) supervise compliance with federal laws and regulations and OTS directives, taking measures needed to enforce such compliance and rehabilitate troubled institutions.

FIRREA provides that OTS assess the institutions it regulates to recapture operating costs. Assessments are based on the OTS budget and are collected from savings and loans semiannually on January 31 and July 31.

## 2. SIGNIFICANT ACCOUNTING POLICIES

### BASIS OF PRESENTATION

OTS has historically prepared its financial statements in accordance with generally accepted accounting principles based upon accounting standards issued by the Financial Accounting Standards Board (FASB), the private-sector standards-setting body. In October 1999, the Federal Accounting Standards Advisory Board (FASAB) was designated by the American Institute of Certified Public Accountants as the standards-setting body for financial statements of federal government entities with respect to the establishment of generally accepted accounting principles. FASAB has indicated, however, that financial statements prepared based upon accounting standards published by the FASB may also be regarded as being in accordance with generally accepted accounting principles for those federal entities such as OTS that have issued financial statements based upon FASB accounting standards in the past. Accordingly, consistent with historical reporting, OTS financial statements are presented in accordance with accounting standards published by FASB.

### CASH AND CASH EQUIVALENTS

Cash and cash equivalents consist of OTS's account at the Department of the Treasury, various imprest funds and other accounts in Washington, DC and at regional offices, and funds invested overnight by Treasury on behalf of OTS.

### INVESTMENTS HELD TO MATURITY

Effective January 1, 1994, OTS adopted Statement of Financial Accounting Standards No. 115, "Accounting for Investments in Certain Debt and Equity Securities". Under the statement, OTS is required to classify investment securities under three categories: (1) trading, (2) available for sale, and (3) held to maturity. All of the agency's investments consist of U.S. Treasury obligations. OTS has the intent and ability to hold these investments to maturity. Therefore, all investments are classified as held to maturity and are stated at amortized cost. Premiums and discounts are amortized over the term of the investments using the straight-line method, which approximates the interest method.

### POST-RETIREMENT BENEFITS

OTS provides certain health and life benefits for all retired employees that meet eligibility requirements. Effective January 1, 1993, OTS adopted Financial Accounting Standards Board (FASB) Statement No. 106 to account for its share of the costs of those benefits. Under this statement, OTS's share of the estimated costs that will be paid after retirement is being accrued by charges to expense over the employees' active service periods to the dates that they are fully eligible for benefits, except that OTS has elected to amortize the transition amount (unfunded cost at January 1, 1993) over twenty (20) years beginning in 1993 in accordance with the option available in the statement. Prior to 1993, the Office of Thrift Supervision expensed its share of the costs as claims were incurred by the retirees and as premiums were paid by OTS. Pursuant to an agreement with the Office of Personnel Management (OPM) in 1994, OTS agreed to pay a one-time fee to OPM in consideration of OPM assuming the health care portion of the post-retirement plan liability.

5



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

### ANNUAL, SICK, AND OTHER LEAVE

Annual leave is accrued as it is earned, and the accrual is reduced as leave is taken. The balance in the accrued annual leave account reflects current pay rates. Sick leave and other types of nonvested leave are charged to operating costs as taken.

### PROPERTY AND EQUIPMENT

Fixed assets acquired by OTS are capitalized at cost. Individual fixed assets in excess of $50,000 and bulk purchases in excess of $250,000 are capitalized. The building owned by OTS is being depreciated over 50 years. The agency's furniture, fixtures and equipment are depreciated over 3 to 5 years. Depreciation is computed on a straight-line basis.

### ASSUMED CAPITAL

The land and building owned by FHLBB were transferred to OTS under FIRREA. OTS also assumed all furniture, fixtures and equipment previously owned by FHLBB. These assets were recorded at their existing book values established in FHLBB's accounting records. Their value is reported as Assumed Capital in the net position section of the comparative Statements of Financial Position.

### INCOME TAXES

As an agency of the U.S. Department of the Treasury, OTS is exempt from all federal and state taxes based on income. The Office of Thrift Supervision is also exempt from state and local property and real estate taxes.

### 3. CASH AND CASH EQUIVALENTS

The following table summarizes the balances of cash and cash equivalents (in thousands):

|  | December 31 | |
|  | 2000 | 1999 |
| --- | --- | --- |
| Cash | $ 615 | $ 752 |
| Overnight investment with Treasury | 27,800 | 17,955 |
| Total cash and cash equivalents | $ 28,415 | $ 18,707 |

Interest earned on overnight investments totaled $2,559,363 and $1,468,709 for 2000 and 1999, respectively.

6

(119)

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

## 4.  INVESTMENTS HELD TO MATURITY

Investment securities held at December 31, 2000 and 1999 are marketable Treasury securities maturing through May 2003.  The amortized cost and market value of these securities are summarized as follows (in thousands):

|  | December 31 | |
|---|---|---|
|  | 2000 | 1999 |
| Face value | $   85,000 | $   105,000 |
| Unamortized premium, net of unamortized discount | 2,224 | 3,703 |
| Book value of investments held to maturity | $   87,224 | $   108,703 |
| Market value | $   86,799 | $   106,386 |

Effective interest rates range from 4.71% to 5.63%.  Interest earned on these investments totaled $5,204,144 and $6,218,222 for 2000 and 1999, respectively.

## 5.  PROPERTY AND EQUIPMENT (in thousands)

The following table summarizes the fixed asset balances:

|  | December 31 | |
|---|---|---|
|  | 2000 | 1999 |
| Land | $   7,101 | $   7,101 |
| Building | 49,188 | 49,188 |
| Furniture, fixtures, and equipment | 7,929 | 5,147 |
|   Total cost | $   64,218 | $   61,436 |
| Accumulated depreciation, building | $   (20,490) | $   (19,438) |
| Accumulated depreciation, furniture, fixtures, and equipment | (5,513) | (4,838) |
|   Total accumulated depreciation | $   (26,003) | $   (24,276) |
| Property and equipment, net | $   38,215 | $   37,160 |

## 6.  WORKERS' COMPENSATION LIABILITY

The Federal Employees' Compensation Act (FECA) provides income and medical cost protection to covered Federal civilian employees injured on the job, employees who have incurred a work-related occupational disease, and beneficiaries of employees whose death is attributable to a job-related injury or occupational disease.  Benefit claims incurred for active and former employees of OTS and its predecessor, the Federal Home Loan Bank Board, are administered by the U.S. Department of Labor (DOL) and are ultimately paid by OTS.  Actuarial estimates of future workers' compensation estimates are generated by DOL.  The estimated actuarial liability for FECA benefits includes the expected liability for death, disability, medical, and miscellaneous costs for approved compensation cases.  The liability is determined using the paid losses extrapolation method calculated over the next 37 years.  This method utilizes historical benefit payment patterns related to a specific incurred period to predict the ultimate payments related to that period.  The annual benefit payments have been discounted to present value using OMB's economic assumptions for 10-year Treasury

7



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

notes and bonds. Based on information provided by DOL and the U.S. Department of the Treasury, OTS estimates that its FECA liability as of December 31, 2000 and December 31, 1999 was $5,623,283 and $4,492,902, respectively. Actual FECA expenses currently payable are included in other accrued liabilities and totaled $897,789 and $960,000 as of December 31, 2000 and December 31, 1999, respectively. Changes in the actuarial liability and payments related to FECA are reflected as reductions or increases in benefits expense in the appropriate year.

## 7.  OTHER ACCRUED LIABILITIES (in thousands)

| | December 31 | |
| --- | --- | --- |
| | 2000 | 1999 |
| Payroll and withholding | $    4,420 | $    4,127 |
| Relocation | 596 | 523 |
| Goods and services | 5,485 | 4,873 |
| Other | 48 | 48 |
| Total other accrued liabilities | $  10,549 | $   9,571 |

## 8.  POST-RETIREMENT BENEFIT LIABILITY

OTS sponsors a life insurance plan (the Plan) for all employees that meet eligibility requirements. The agency funds benefit costs principally on a pay-as-you-go basis, with retiree contributions that are adjusted annually based on certain factors, some of which are discretionary. The Plan is unfunded, with participants paying a portion of the costs. As stated in the Significant Accounting Policies, OTS changed its accounting policy with respect to the Plan as of January 1, 1993. OTS elected to defer recognition of the Plan's transition obligation, and amortize such obligation over twenty (20) years on a straight-line basis.

A Memorandum of Understanding (MOU) was signed in December 1994 between OPM and OTS. The purpose of the MOU was to implement legislation permitting annuitants who retired from OTS prior to January 1995, and who were enrolled in the OTS health plan, to enroll in the Federal Employees Health Benefits Program (FEHB) for coverage effective on or after January 8, 1995. OTS agreed to pay a one-time fee to OPM of approximately $10,993,000 in consideration of OPM assuming the health portion of the post-retirement plan liability. In accordance with FASB 106, the agreement with OPM constitutes a settlement and, accordingly, OTS recognized a gain on the settlement of approximately $16,694,000 in 1994. Such gain includes the health portion of the transition obligation that OTS elected to initially recognize over 20 years in 1993. The post-retirement liability of $9,269,359 in the comparative Statements of Financial Position at December 31, 2000, and $8,240,354 at December 31, 1999 represent OTS's recognized portion of the remaining liability for participants' future life insurance benefits.

8



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

Net periodic post-retirement benefit cost for life insurance provisions under the Plan included the following components in 2000 and 1999 (in thousands):

|  | For the Years Ended December 31 | |
|  | 2000 | 1999 |
| --- | --- | --- |
| Service cost - current year | $     235 | $     264 |
| Interest on accumulated post-retirement benefit obligation | 760 | 729 |
| Amortization of transition obligation | 298 | 298 |
| Amortization of loss | (2) | 0 |
| Net post-retirement benefit expense | $   1,291 | $   1,291 |

The following table sets forth the Plan's funded status reconciled with the liability recognized in the Statements of Financial Position (in thousands):

|  | December 31 | |
|  | 2000 | 1999 |
| --- | --- | --- |
| Accumulated post-retirement benefit obligation: | | |
| Retirees | $   4,029 | $   3,747 |
| Other fully eligible participants | 5,594 | 5,142 |
| Other active participants | 2,286 | 2,104 |
| Accumulated post-retirement benefit obligation | 11,909 | 10,993 |
| Unrecognized transition obligation | (3,578) | (3,877) |
| Unrecognized net gain | 938 | 1,124 |
| Total post-retirement benefit liability | $   9,269 | $   8,240 |

The weighted average discount rate used in estimating the accumulated post-retirement benefit obligations at December 31, 2000 and December 31, 1999 was 7%.

## 9.  RENTAL INCOME

OTS leases a portion of its building space to retailers under noncancellable operating leases expiring at various dates through 2008. Some of the leases provide renewal options. The leases provide for annual base rent, some are subject to contingency rents for increased building costs, annual increases based upon changes in the Consumer Price Index, or a percentage of sales in excess of a specified amount. Other leases provide for fixed future increases in rents over the term of the lease. OTS also subleases some of its existing unused leased facilities under similar terms.

9



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

The future minimum rentals to be received under both types of noncancellable operating lease arrangements are as follows (in thousands):

| Years ending December 31 | Leases | Subleases | Total |
|---|---|---|---|
| 2001 | $ 2,277 | $ 475 | $ 2,752 |
| 2002 | 2,541 | 448 | 2,989 |
| 2003 | 2,229 | 448 | 2,677 |
| 2004 | 224 | 460 | 684 |
| 2005 | 174 | 179 | 353 |
| Thereafter | 457 | 0 | 457 |
| | $ 7,902 | $ 2,010 | $ 9,912 |

Rental income totaled $2,793,443 and $2,686,026 for 2000 and 1999, respectively.

## 10. RETIREMENT PLANS

OTS employees participate in three retirement systems that are classified as multi-employer plans. Two are administered by OPM. For funding purposes, these two plans function as defined contribution plans; however, the retirement benefits accrue in a manner consistent with a defined benefit plan. The third is a private defined benefit plan administered by the Financial Institutions Retirement Fund (FIRF).

The Civil Service Retirement System (CSRS) is two-tiered. For employees hired prior to January 1, 1984, OTS withholds 7.4 percent of regular earnings. OTS contributed 8.51 percent of regular earnings in 2000 and 1999 for each employee in this tier. The sum is transferred to the Civil Service Retirement Fund, from which this employee group will receive retirement benefits. Employees do not contribute to, or receive benefits from, the Social Security System.

For employees with more than five years of (not necessarily continuous) service, hired on or after January 1, 1984, OTS withholds 1.2 percent of regular earnings, in addition to Social Security withholding. OTS also contributed 8.51 percent of regular earnings in 2000 and 1999 for each employee in this tier. At the point regular earnings exceed the FICA maximum wages ($76,200 for 2000), employees covered under this tier of CSRS are required to have 7.4 percent of their earnings withheld. This employee group will receive retirement benefits from both CSRS and the Social Security System.

Beginning in January 1987, all employees hired since January 1, 1984, either as new employees or having less than five years of accumulated service (with a break in service over one year) are included in the Federal Employee Retirement System (FERS). For these employees, OTS withheld 1.2 percent and 0.8 percent of regular earnings in 2000 and 1999, respectively. The agency contributed 10.7 percent of regular earnings in 2000 and 1999 for FERS employees. This group of employees will receive benefits from FERS as well as the Social Security System, to which they concurrently contribute.

Pursuant to FIRREA, the Office of Regulatory Activities (ORA) and its twelve examination districts became part of OTS. OTS assumed the cost of ORA's retirement system, which is part of FIRF. Under this private retirement system, OTS contributes a percentage of total FIRF salary. The percentage varies from year to year. Employees do not contribute to FIRF but do contribute to the Social Security System. Changes in percentages are based on the number of active FIRF OTS employees, the number of people that have retired, the benefits paid out, and adjustments to the actuarial gain or loss.

The Office of Thrift Supervision funds either all FIRF or a portion of CSRS and FERS pension benefits under any of the aforementioned retirement systems relating to its employees and makes the necessary payroll withholdings. However,

10



UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

OTS does not account for the assets of either retirement plan nor does it have actuarial data with respect to accumulated plan benefits or the unfunded pension liability relative to its employees. These amounts are reported by the Office of Personnel Management for both government retirement systems and are not allocated to the individual agencies.

In years prior to 1997, OTS was not required to fund the FIRF plan due to changes in retirement plan provisions of the Internal Revenue Code and cumulative net actuarial experience gains. OTS established a prepaid asset representing the Future Employer Contribution Offset, and adjusted its balance and the corresponding expense annually according to actuarial valuation reports prepared by the Plan Administrator. In 1997, OTS elected to eliminate this prepaid asset by amortizing the remaining balance over three (3) years ending in 1999. This change was due to the FIRF plan's status as a multi-employer plan and as such, the inherent uncertainty of the Office of Thrift Supervision's portion of the Future Employer Contribution Offset.

In addition to the retirement plans described above, OTS employees have the option of participating in retirement savings plans. Employees covered under CSRS or FERS may participate in the OPM-sponsored Thrift Savings Plan (TSP), a plan with characteristics similar to a private-sector 401(k) plan. Civil Service Retirement System and Federal Employee Retirement System covered employees may also participate in the Financial Institutions Thrift Plan (FITP), a 401(k) plan. Employees covered under FIRF may participate in FITP only. All employees may contribute up to 15% of their earnings to the plans. OTS makes matching contributions of up to 7% to the plans for FERS and FIRF participants and up to 2 % for CSRS participants.

The retirement expenses for all OTS plans, included in benefits expense in the accompanying comparative Statements of Operations and Changes in Net Position, are as follows (in thousands):

|  | For the Years Ended December 31 | |
|  | 2000 | 1999 |
| --- | --- | --- |
| CSRS | $        1,468 | $        1,557 |
| FERS | 2,200 | 1,787 |
| FIRF | 0 | 3,261 |
| TSP | 883 | 784 |
| FITP | 4,412 | 4,310 |
|  | $        8,963 | $       11,699 |

## 11. DEFERRED COMPENSATION LIABILITY

As part of FIRREA, OTS assumed the Deferred Compensation Plans of the employees working for the Federal Home Loan Banks of Dallas and San Francisco. These plans allowed employees to defer a portion of their income and provided for employer matching contributions. OTS froze these plans and discontinued all plan deferrals or employer matches effective January 1, 1991. Benefits under the assumed plans were intended to be provided by cash value of life insurance policies issued by Mutual Benefit Life that went into rehabilitation on July 16, 1991. Under the rehabilitation plan, withdrawal of cash value prior to December 31, 1999 was restricted and subject to substantial withdrawal penalties. Current plan withdrawals have been funded by OTS. The cash values of those policies, included in other assets in the accompanying comparative Statements of Financial Position, are approximately $1,832,000 in 2000 and $1,840,000 in 1999.

## 12. LEASE COMMITMENTS

OTS conducts most of its regional operations in leased facilities under noncancellable operating leases expiring at various dates through 2011. Many of the leases contain a provision to renew at the end of the initial term for an additional one to

11



137

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

ten years. The rental payments are based on a minimum rental plus a proportional share of building operating expenses and taxes.

Some of the operating leases provide for rental escalations or stated annual rental increases in the amount of base rent over the lives of the leases. The accompanying comparative Statements of Operations and Changes in Net Position reflect rent expense on a straight-line basis over the lives of the leases.

The minimum rental commitments under noncancellable operating leases are as follows (in thousands):

| Years ending December 31 | |
| --- | --- |
| 2001 | $    5,828 |
| 2002 | 5,890 |
| 2003 | 5,839 |
| 2004 | 5,677 |
| 2005 | 4,302 |
| Thereafter | 11,378 |
| | $   38,914 |

Rent expense under noncancellable operating leases totaled $5,332,986 and $5,040,969 in 2000 and 1999, respectively.

## 13.  COMMITMENTS AND CONTINGENCIES

OTS is defending several lawsuits that could subject OTS to expenditure of funds. In each of these cases, OTS believes it has substantial legal and factual defenses to the claims asserted, and believes it is more likely than not that OTS will prevail.

In addition, there are approximately 118 lawsuits pending (including four with appealed judgments for plaintiff) against the United States in the U.S. Court of Federal Claims in connection with the elimination of the capital treatment of supervisory goodwill of certain thrift institutions. These cases arise from the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. The U.S. Department of Justice is defending these cases on behalf of the United States. The Department of Justice Appropriations Act, 1999, provides a specific appropriation to pay judgments and compromise settlements in the supervisory goodwill cases. Furthermore, 28 U.S.C. Sec. 2517 provides that any judgment issued by the Court of Federal Claims must be paid from appropriated funds. An appropriation was established within the Department of Justice to fund any judgments under this litigation. Therefore, OTS funds, which are non-appropriated, cannot be used to pay judgments in these cases. For the aforementioned reasons, OTS has made no loss accrual for these cases.

12

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF THRIFT SUPERVISION

NOTES TO FINANCIAL STATEMENTS

There are also five "tax benefits" lawsuits (including one case that also contains supervisory goodwill claims) brought by thrifts and thrift investors in the U.S. Court of Federal Claims. In these cases, which are being handled by the Department of Justice, the plaintiffs seek damages from the United States arising from 1993 changes in the tax laws, whereby Congress eliminated the favorable tax treatment of certain thrift acquisitions. There is no specific appropriation for the payment of judgments or settlements in these cases. As noted above, however, any judgment issued by the Court of Federal Claims must be paid from appropriated funds. Therefore OTS funds, which are non-appropriated, cannot be used to pay judgments in these cases. For this reason, OTS has made no loss accrual for these cases.

13



**SUBJECT**: Discrimination Complaint of Robin Olebara and Paul H. O'Neill, Secretary of the Treasury, TD Case Number: 02-2378TM

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY**

In accordance with the following provisions of 28 U.S.C. 1746, I, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

**Please state your name, title, grade, location, age, gender and your past EEO complaint activity (i.e. management official, complainant, witness, etc)**

Scott M. Albinson; Managing Director, Supervision; TG-301-28; age 43; male. I have no previous involvement with the EEO process.

**Provide a brief description of your job duties. State how long you've been in this current position, and profile your span of supervision.**

I have served as Managing Director, Supervision since approximately 1998. In this position, I am responsible for the Agency's policy, accounting, risk management, regulatory applications, economic analysis, and internal review functions. I have eight units and approximately 64 employees reporting to me. Occasionally, other offices/units perform special projects for me.

**What was your supervisory relationship to the Complainant and the duration of this relationship? (i.e. 1st line, 2nd line supervisor, etc)**

Ms. Olebara was a secretary in Compliance Policy. Her supervisor was Richard Riese, who is one of my direct reports. As part of a realignment, I became her second line supervisor in early 2002 when the Compliance Policy unit was placed under my supervision.

**The Complainant is alleging that her past EEO activity was a contributing factor in her termination. Are you aware of the Complainant's past EEO activity? What were the**

Page 1 of 6



issues? When did this activity occur? What role did you play in this past activity?

I have no knowledge of any past EEO activity by Ms. Olebara.

**State in chronological order all dealings with the termination of the Complainant due to a reduction in force (RIF). Specify the dates of the events (meetings, recommendations, decisions, etc) occurred, who was involved and what happened.**

The singular most important event was the decision by the Director in the early months of 2002 that the Agency must reduce its' spending, and thereby conduct a RIF, in order to maintain financial viability. I attended a meeting in early to mid February 2002 conducted by Deputy Director Riccobono. Mr. Riccobono announced to senior Washington and Regional managers the Director's decision to conduct a RIF in order to balance the Agency's budget. (The Agency had run a significant budgetary deficit for the previous few years.) I remember the Deputy Director instructing Agency managers that everyone had to take a hard look at their staffing levels and be prepared to cut excess positions in a RIF in the spring of 2002. Managers were told to identify positions that could be eliminated and that Human Resources would prepare the necessary paperwork to conduct the RIF.

**How many of your employees were terminated due to RIF (specify by name/title)?**

To the best of my recollection, the following positions in my units were terminated due to RIF in 2002:

| | | |
|---|---|---|
| COMPLIANCE | JENKINS, CYNTHIA D | PROGRAM ANALYST (TRAINEE) |
| COMPLIANCE | OLEBARA, ROBIN C | ADMINISTRATIVE SECRETARY II |
| COMPLIANCE | RUDDER, SHARON A | ASSISTANT PROGRAM ANALYST |
| EXAMINATION POLICY | GILPIN, TERESA L | REGULATORY ANALYST |

**What knowledge did you have of this RIF process?**

The Deputy Director notified all managers of the Agency's decision that cuts had to be made. I
Page 2 of 6



do not have any knowledge of the RIF process itself. I believe that Sue Rendleman, Director of Human Resources, and her staff handled the mechanics of the process.

**What specifically were you told about the RIF and who/what positions would be terminated?**

At this meeting I (and other managers) were told that personnel cuts were imperative for the financial survival of the Agency. We were told to identify positions that could be eliminated to save money without losing the effectiveness of the Agency. We were also told to think about how the Agency could work smarter and how work could be re-engineered. For example, we were to consider whether positions could be eliminated and the remaining work distributed to others. Although it did not directly affect my units, there was some discussion about the regional offices needing to eliminate administrative positions and reallocating that work to Washington headquarters.

**Did you have a choice or option of which employees would be RIF'd? Please explain.**

As an executive level manager, I had a choice of units to eliminate positions and the types of positions to eliminate. As the list above shows, in my unit, the decision was made to eliminate three analyst positions and one secretarial position. These were the positions that we could afford to lose without adversely impacting the effectiveness of the units.

Once the positions were identified, I had no choice or discretion as to which employee was separated from the agency. Human Resources applied the RIF rules to determine how employees would be affected by the RIF.

Page 3 of 6



**Specifically, why was the Complainant RIF'd?**

The secretarial position in Compliance Policy was identified as one that could be eliminated without harming office operations.

**Please respond to the Complainant's allegations:**

  a.    **Complainant is alleging that she was not given the same "bump and retreat" rights that were given to other employees**

I do not know the details of how a RIF works. Please ask the Human Resources staff.

  b.    **Complainant states that she was discriminated against on the basis of race, color, gender, age and retaliation for prior EEO activity when after her termination, she was not later offered the position of Contract Specialist that was filled by an employee outside of OTS**

I do not have any facts to answer this question. Please ask the Human Resources staff.

  c.    **Complainant alleges that OTS willfully and intentionally delayed submitting her retirement package to OPM that she completed in June 2002**

I do not have any information to answer this question. Please ask the Human Resources staff.

  d.    **Complainant claims that all African American females were terminated by the RIF and no white ScheduleA TG-12 secretaries were affected**

It is not true that OTS RIF'd all African American females. I do not have the necessary information to answer the question regarding grade 12 secretaries. Please ask the Human Resources staff.

Page 4 of 6



e.    **Complainant states that her position of Administrative Secretary was eliminated, however the unit and work still exists. As a result, Ann Timbers (white, female) with less seniority was protected.**

It is true that Ms. Olebara's position was eliminated and that the Compliance Policy unit still exists. However, I do not have the necessary information to answer the question regarding Ms. Timbers. Please ask the Human Resources staff.

f.    **Please respond to the complainant's allegation that since her termination, a Procurement employee, James Harden has left OTS and will be replaced with someone other than herself who is qualified for this position.**

I do not have the necessary information to answer the question regarding Mr. Harden. Please ask the Human Resources staff or the manager of Procurement.

**Do you have any additional information that is pertinent to this case?**

The executive management team at OTS, including myself, under Director Gilleran and previous Directors has been a strong supporter of EEO and has fostered an attitude of respect for all employees.



Page 5 of 6



164

I declare under penalty that the foregoing is true and correct.

Executed on <u>November 25, 2002</u>  at  <u>Washington, DC</u>
              (Date)                            (City/State)

Signature: _____

Name:  <u>Scott M.. Albinson</u>

Title:  <u>Managing Director, Supervision</u>

Address:  1700 G Street, NW
            Washington, DC 20552

Page 6 of 6

165

**SUBJECT:** **Discrimination Complaint of Robin Olebara and Paul H. O'Neill, Secretary of the Treasury, TD Case Number: 02-2378TM**

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the following provisions of 28 U.S.C. 1746, I, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

**Please state your name, title, grade, location, age, gender and your past EEO complaint**

**activity (i.e. management official, complainant, witness, etc).** Richard Riese; Director,

Compliance Policy; TG 25, Washington, D.C.; 50; male. I have been a deponent in a prior EEO

complaint made by Robin Olebara and an affiant in connection with an EEO complaint made by

former OTS attorney Ivana Terango.

**Provide a brief description of your job duties. State how long you've been in this current**

**position, and profile your span of supervision.** I manage the unit that develops policy

guidance for thrifts and examiners covering consumer protection and other regulatory

requirements. I have had this position since April, 1999. During that period the number of

employees in the unit under my direction, and for whom I served as rating official, has been as

many as 12 to as few as six (current).

**What was your supervisory relationship to the Complainant and the duration of this**

**relationship? (i.e. 1st line, 2nd line supervisor, etc)** I was Robin's first line supervisor for the

2001 and 2002 rating periods. I did not serve as Robin's supervisor until after Tim Burniston left

the agency in mid-2000.

Page 1 of 5

(153)

**The Complainant is alleging that her past EEO activity was a contributing factor in her termination. Are you aware of the Complainant's past EEO activity? What were the issues? When did this activity occur? What role did you play in this past activity?** I was aware that Robin had filed a prior EEO complaint and as I understood her issues involved displacement from a prior position due to an earlier RIF and something about training opportunities. I played no decision-making role in the events that were the basis of Robin's prior complaint as they all preceded the period that I was her supervisor.

**State in chronological order all dealings with the termination of the Complainant due to a reduction in force (RIF). Specify the dates of the events (meetings, recommendations, decisions, etc) occurred, who was involved and what happened.** I had no dealings with the termination of the Complainant due to the 2002 RIF, other than to sign required separation paperwork and to prepare her close-out performance evaluation conducted on July 19, 2002.

**How many of your employees were terminated due to RIF (specify by name/title)?** Compliance Policy unit employees terminated due to the elimination of their positions in connection with the 2002 RIF were Sharon Rudder, Assistant Program Analyst; Cynthia Jenkins, Program Analyst (Trainee) and Robin Olebara, Secretary. Deborah Goddard's Program Analyst position in Compliance Policy was also eliminated, but she had the ability to accept a paralegal position in the Litigation Division of the Chief Counsel's office.

Page 2 of 5





**What knowledge did you have of this RIF process?** In a meeting in mid-March attended by Washington office managers, Deputy Director Riccobono announced the commencement of RIFs in the regions and of non-bargaining unit staff in DC. At that meeting, he informed us that the RIF process would extend to DC bargaining unit employees at some point after manpower needs were evaluated and union bargaining obligations were met. We were informed that agency budgetary constraints were the impetus for the RIFs.

**What specifically were you told about the RIF and who/what positions would be terminated?** I was advised by Managing Director Albinson and Deputy Director Riccobono in a phone call that Compliance Policy employees Sharon Rudder, Cynthia Jenkins, Robin Olebara and Deborah Goddard would have their positions eliminated in connection with the RIF to be proposed to the union.

**Did you have a choice or option of which employees would be RIF'd?** No. I did not select the positions to be eliminated. **Please explain.**

**Specifically, why was the Complainant RIF'd?** My general understanding is that Complainant and other employees in Washington were RIF'd in response to agency budgetary constraints.

**Please respond to the Complainant's allegations:**

    a. **Complainant is alleging that she was not given the same "bump and retreat" rights that were given to other employees** (I have no information upon which to

Page 3 of 5





168

base a response to this allegation from my personal knowledge.)

b.  **Complainant states that she was discriminated against on the basis of race, color, gender, age and retaliation for prior EEO activity when after her termination, she was not later offered the position of Contract Specialist that was filled by an employee outside of OTS** (I have no information upon which to base a response to this allegation from my personal knowledge.)

c.  **Complainant alleges that OTS willfully and intentionally delayed submitting her retirement package to OPM that she completed in June 2002** (I have no information upon which to base a response to this allegation from my personal knowledge.)

d.  **Complainant claims that all African-American females were terminated by the RIF and who White Schedule A TG-12 secretaries were affected** (I have no information upon which to base a response to this allegation from my personal knowledge.)

e.  **Complainant states that her position as Administrative Secretary was eliminated, however the unit and work still exists.  As a result, Ms. Ann Timbers (White, Female) with less seniority was protected and given the work.** Complainant's position was eliminated.  The Compliance Policy unit still exists and administrative work has been re-distributed to remaining Compliance Policy staff (who perform administrative tasks themselves) and to other secretaries, including Ms. Timbers and Ms. Semy Jenkins.



Page 4 of 5



169

**Do you have any additional information that is pertinent to this case?** No.

I declare under penalty that the foregoing is true and correct.

Executed on _____December 2, 2002_____ at _____Washington, D.C._____
　　　　　　　　　　　　(Date)　　　　　　　　　　　　　　(City/State)

　　　　　　　　　　　　　　　　　　　　Signature: ___[signature]___

　　　　　　　　　　　　　　　　　　　　Name: _____Richard R. Riese_____

　　　　　　　　　　　　　　　　　　　　Title: _____Director, Compliance Policy_____

　　　　　　　　　　　　　　　　　　　　Address: _____Office of Thrift Supervision

　　　　　　　　　　　　　　　　　　　　_____1700 G St., N.W._____

　　　　　　　　　　　　　　　　　　　　_____Washington, D.C._____

　　　　　　　　　　　　　　　　　　　　_____20552_____

(157)

170


**SUBJECT**: Discrimination Complaint of Robin Olebara and Paul H. O'Neill, Secretary of the Treasury, TD Case Number: 02-2378TM

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY**

In accordance with the following provisions of 28 U.S.C. 1746, I, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

**Please state your name, title, series and grade, duty location, race, color, gender, age and your past EEO activity (i.e. witness, complainant, management official, etc)**

My name is Marie Janios and I am a Program Manager, Staffing and Outplacement, TG-201-22 in the Office of Thrift Supervision, Human Resources Division, in Washington, DC. I am a white female, age 53.

**Provide a brief description of your current professional role with the Agency. State how long you have been in your current position, and profile your span of supervision.**

I am employed by the Office of Thrift Supervision ("OTS") as Program Manager, Staffing and Outplacement. I have been employed by OTS since its inception in October 1989, and with OTS's predecessor agency since February 1972.

The responsibilities of my position include, among other functions, management and oversight of the Human Resources staffing function for OTS's headquarters and regional offices, including conducting Reductions in Force in accordance with applicable laws, regulations, and procedures.

**Did you know the Complainant personally? Were you aware of her race, color, gender, age and prior EEO activity?**

Page 1 of 1



I was aware that Ms. Olebara is a black female but did not know her age. I know that she has filed numerous EEO complaints over the past several years because various EEO investigators have contacted me to obtain information and answer questions.

**Please state what your role was in the realignment/RIF process.**

I was responsible for ensuring that the reduction in force was carried out in accordance with appropriate laws and regulations found in 5 CFR Part 351. My responsibilities included: assigning competitive levels, developing retention registers; releasing employees from their competitive level; determining assignment rights and preparing specific notices.

**The Complainant claims that she met with you regarding her "bump and retreat" rights. Please state your knowledge of the "bump and retreat" rights. What was said when you met with the Complainant? Did the Complainant qualify for these rights? If not, why not? Please be specific. What circumstances qualified Deborah Goddard for these rights? How did her circumstances differ from the Complainant's?**

Ms. Olebara came to my office and asked about her bump and retreat rights. We talked briefly and I summarized her individual employment record. The individual employment record was a summary listing of all the positions and grades that Ms. Olebara held as a federal employee. These positions were used to determine whether or not she had assignment rights (bump or retreat) to OTS positions. Ms. Olebara was in Tenure Group I, Subgroup B (Career employee – non-veteran). I explained that she had no bump rights since there were no employees in a lower Tenure and Subgroup (Tenure Group II or III – veteran or non-veteran) whom she could displace. I explained that she had no retreat rights since there were no employees with lower retention standing occupying positions that she held previously in her federal career. I gave her a copy of

Page 2 of 2



her employment record that was used in determining whether or not she had assignment rights and asked if she had any questions.  She replied no and left.

Deborah Goddard was released from her position of Program Analyst (Compliance), TG-343-16.  A review of her assignment rights found that she was entitled to retreat to her former position of Senior Paralegal, TG-950-16 since the position was occupied by an individual with a lower retention standing (less service).

Ms. Goddard's circumstances differed from Ms. Olebara's because she was able to retreat to (take back) a position in the same grade level and occupational series as one she previously held at OTS because the position was held by an individual with a lower retention standing (less service).  Specifically, this individual's adjusted service computation date was later than Ms. Goddard's.  Ms. Olebara's employment history was also reviewed.  However, there were no individuals occupying positions in the same series or at grade levels previously held by Ms. Olebara in her federal employment.  Retreat rights provide for a released employee to retreat to a position that:  (1) is held be an employee with a lower retention standing; and (2) is not more than three grade levels or its equivalent below the position from which the employee was released; and (3) is the same position or an essentially identical position, to one formerly held by the released employee.



**The Complainant states that she should have had "bump and retreat" rights to the position held by Procurement Assistant, Miriam Neale since she once held that position. Why did the Complainant not qualify for this? What specifically qualified Miriam Neale for this position?**

Ms. Neale is a Procurement Assistant, TG-1106-11. The TG-11 level was determined to be representative of a GS-7 in the federal classification system. Based on a review of Ms. Olebara's employment history, it was determined that she did not have assignment rights (bump or retreat rights) to Ms. Neale's position.

Ms. Olebara was not able to bump Ms. Neale. An employee may bump to a position that is held by anyone in a lower group or subgroup. This means that a Tenure Group I employee could bump anyone in Tenure Group II or Tenure Group III whether veteran or non-veteran. Ms. Neale is in Tenure Group I - Subgroup B (Career – nonveteran). Since she was in the same Tenure and Subgroup as Ms. Olebara (Tenure Group I – Subgroup B), Ms. Olebara could not exercise a bump assignment right.

An employee may retreat to a position that is occupied by an individual in the same tenure and subgroup and is the same job or essentially identical to one previously held in the federal service. Ms. Olebara never occupied a position in the 1106 occupational series and therefore had no rights to retreat that position held by Ms. Neale in the 1106 series. Her employment history showed that she held a GS-1105-6 position in another federal agency. The 1105 and 1106 occupational series are separate occupational series and require performance of different duties and responsibilities. The 1105–Purchasing series which was the one assigned to Ms. Olebara

Page 4 of 4



requires the employee to perform assignments involved in the acquisition of supplies and

services by purchase, rental or lease. The work requires knowledge of policies and procedures

for delivery orders and small purchases. The 1106–Procurement Clerical or Technical series

includes positions which involve performing work that supports the procurement of supplies, or

services. These individuals prepare, control and review procurement documents and reports,

verify information, contact vendors, maintain procurement files and contact vendors to resolve

discrepancies. Positions classified in different occupational series are not considered to be

identical positions because they involve different duties and responsibilities.

**Please respond to the Complainant's claim that she was denied an opportunity for**

**employment when, after her termination, an outside person was hired to replace Contract**

**Specialist James Harden, even though the Complainant was qualified for this position.**

The position occupied by James Harden, Senior Contract Specialist, TG-1102-19 has not been

filled and there are no plans to fill the vacancy. Ms. Olebara, a TG-318-12, Administrative

Secretary II, is not qualified for a position in the 1102 series because she does not meet the

current qualification requirements.

**Please respond to the Complainant's allegation that Ann Timbers, another Administrative**

**Secretary, with less seniority was protected.**

Ms. Timbers did not compete with Ms. Olebara on the retention register because Ms. Timbers is

in the excepted service and under the RIF regulations employees are placed on a retention

register based on their competitive or excepted service status, work schedule, position, series and

grade. As a result, result there were two retention registers, one with competitive service

employees and the other with excepted service employees. The RIF action that resulted in the

Page 5 of 5



elimination of the Administrative Secretary II, TG-318-12 position held by Ms. Olebara was conducted in the competitive service. Ms. Olebara competed for her position with other competitive service employees.

**How do you respond to the Complainant's claim that it wasn't all of the TG-12 secretarial positions were eliminated, but only the "Black, CSRS, TG-12 secretarial positions were eliminated".**

Employees were released from their competitive levels in accordance with their placement on the retention register for the competitive level (CL-12-05) that listed all Washington competitive service Administrative Secretary II's. Employees were released from the competitive level in inverse order of their retention standing beginning with the employee with the lowest retention standing on the register. The factors used in determining placement on the retention register are: tenure; veterans' preference; length of service (service computation date) and adjusted service computation date to reflect performance within the past three years. The Administrative Secretaries retained had higher retention standing than those separated.

**The Complainant is claiming that OTS willfully and intentionally delayed submitting her retirement package to OPM thus causing her financial hardship. Please respond to this allegation. What paperwork was submitted? When was the paperwork completed by the Complainant? What is the normal process when this paperwork is submitted? When was the paperwork sent to OPM? If there was a delay in the processing of the paperwork, what was the reason for the day? Please provide any documentation you have regarding this**

Page 6 of 6



**issue.**

I have no knowledge regarding the submission of the retirement paperwork.

**Do you have any other pertinent information regarding this complaint?**

No.

I declare under penalty that the foregoing is true and correct.

Executed on ___11-15-02___ at ___Washington, D C___
                (Date)                        (City/State)

Signature: _____

Name:  __Marie F. Janios__

Title:  __Program Manager, Staffing and Outplacement__

Address:  __Office of Thrift Supervision__

                 __1700 G Street, NW__

                 __Human Resources Division__

                 __Washington, DC  20552__

Page 7 of 7



**SUBJECT:** Discrimination Complaint of Robin Olebara and Paul H. O'Neill, Secretary of the Treasury, TD Case Number: 02-2378TM

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the following provisions of 28 U.S.C. 1746, I, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

**Please state your name, title, location, race, color, gender, age and prior EEO activity (e.g. as a witness, complainant, management official, etc.)**

Sandra B. Thomas, Benefits Analyst, Black Female, age 49, Human Resources Office, Washington, D.C. I have no prior EEO activity.

**Please provide a short description of your current professional role with the Agency.**

As a Benefits Analyst, I process federal retirement packages for submission to OPM, answer questions from employees on a number of benefits programs, and process personnel actions.

**Did you know the Complainant personally?**

Yes. I have worked at this agency for over 20 years and in my role as Benefits Analyst, I know almost everyone in Washington.

**The Complainant claims that OTS willfully and intentionally delayed submitting her retirement package to OPM that she completed in June 2002. What role did you play in the processing of her package? When did you receive her completed package? When did you send it to OPM? Was her package sent timely? If not, why not?**

I was responsible for processing Ms. Olebara's retirement papers and I gave her excellent

Page ☐ PAGE ☐1☐ of ☐ NUMPAGES ☐3☐



service. The effective date of the retirement was July 26, 2002. Ten working days later, on August 8, the package was delivered to OPM.

Please see my response below for additional information.

**What conversations did you have with the Complaiant regarding her package?**

**What was said?**

I remember having a few telephone conversations with Ms. Olebara during the 60-day period between her receipt of the RIF notice and her actual departure. Due to her concerns about receiving her annuity, I gave Ms. Olebara the most favorable and prompt treatment for processing her retirement package.

**Explain why a retirement package would not be processed to OPM until after the effective date of a personnel action, e.g. RIF, retirement, etc.**

**Please provide a list of employees affected by the restructuring whose retirement packages you processed. Include names, position titles, package received date, and the submission date to OPM. Were these individuals treated similarly to the Complainant? If not, why not?**

OTS eliminated the positions of over 200 employees in a RIF in 2002. Of these employees, approximately 30, including Ms. Olebara, were eligible to retire under the federal retirement program. I processed all of the retirement application packages for these retirees, but did not keep a list of them.

In a RIF situation, the retirement application cannot be processed until the employee officially comes off of the payroll at the end of the RIF notice period because sometimes RIF notices can be cancelled. The human resources office receives a termination Standard Form 50 from the payroll office at the end of the RIF notice period that permits the processing of retirement applications. My records show that Ms. Olebara's RIF action became effective on the close of business on Friday, July 26, 2002 and that I sent her retirement package via Federal Express to the Office of Personnel Management on Thursday, August 8, 2002. This was a very busy time for me, but I submitted her retirement package as quickly as I could due to her concerns.

**Do you want to add anything else?**



I always try to spend as much time as I can explaining the retirement process to employees. In this case, I went out of my way to assure Ms. Olebara that her package would be submitted to OPM at the earliest possible date. I believe she fully understood this at the end of our phone conversation. Her package was about the first I sent to OPM.

I declare under penalty that the foregoing is true and correct.

Executed on _12/4/02_ at _WASHINGTON, D.C._
          (Date)                    (City/State)

Signature: _Sandra B. Thomas_

Name: _SANDRA B. THOMAS_

Title: _Benefits Analyst_

Address: _Office of Thrift Supervision_

_1700 G Street, N.W._

_WASHINGTON, D.C._
          _20552_





**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6000

MAY 6 2002

**MEMORANDUM FOR:**   Robin Olebara

**FROM:**                        Sue A. Rendleman
                                     Director of Human Resources

**SUBJECT:**                  Specific Notice of Reduction in Force

This is notice that you will be separated from the Office of Thrift Supervision ("OTS") due to a reduction-in-force ("RIF") effective at the end of your regularly scheduled tour of duty on July 26, 2002. The RIF is being conducted due to budgetary constraints.

You will be released from your current position and we are unable to offer you assignment to another OTS position. This RIF action is being conducted in accordance with 5 CFR Part 351, Reduction-in-Force Regulations, the OTS Collective Bargaining Agreement and Memoranda of Understanding, and after a careful review of the retention rights of OTS Competitive Service, Washington, D.C. employees. Specific information concerning your retention status is as follows:

<u>**Retention Preference Information**</u>

**Present Position:** Administrative Secretary II
**Series and Grade Level:** TG-318-12
**Tenure Group and Subgroup:** IB
**Type of Service:** Competitive
**Service Computation Date (SCD):** 7/6/74
**Adjusted SCD Using Last Three Performance Ratings:** 7/6/54
**Performance Appraisal Ratings of Record:**
        1999: Exceptional
        2000: Exceptional
        2001: Exceptional
**Competitive Area:** Washington, DC
**Competitive Level:** DC-12-05
**Last Day of Active Duty in Present Position (RIF Effective Date):** July 26, 2002



238

-2-

**Duty Status During Notice Period and Right to Review**

You will be in a paid duty status during the 60-day notice period. However, you may resign at any time after receipt of this notice and your resignation may be effective on the date you specify or on the separation date.

You have a right to review the regulations contained in 5 CFR Part 351. You may also review the retention register and any other records related to this notice. You may review this information and discuss the action planned in your case by contacting Marie Janios, in the Human Resources Division. Ms. Janios may be reached on (202) 906- 6070.

**Entitlement**

You are entitled to the following checked items:

_____Severance Pay
_____X_____Enrollment in the OTS Re-employment Priority Program
_____X_____Enrollment in the Treasury Department Career Transition Assistance Program (CTAP)
_____X_____Enrollment in the Treasury Department's Priority Placement Program (TPPP)
_____Optional Retirement
_____X_____Unemployment Compensation (as determined by the appropriate jurisdiction)
_____X_____Discontinued Service Retirement

Information on your individual entitlements may be found in the attached folder. Any annual leave to your credit upon your separation will be paid in a lump sum, subject to applicable withholdings.

**YOUR APPEAL OR GRIEVANCE RIGHTS ARE:**

_____As a non-bargaining unit employee, you may file an appeal of your separation under RIF procedures with the MSPB. Your appeal may be filed at any time during the period beginning the day after the effective date of the action, but no later than thirty (30) calendar days from the effective date. The appeal should be addressed to:

Merit Systems Protection Board (MSPB)
Washington DC Regional Office
1800 Diagonal Road, Suite #205
Alexandria, VA  22314-2840

Phone:  (703) 756-6250
FAX:    (703) 756-7112



239

-3-

Copies of the MSPB regulations and appeals forms are contained in the attached folder. Your appeal should contain: your name; address; telephone number; copy of the separation notice; specific reason(s) you believe this action is improper (including any proof or pertinent documents), and an indication whether you want a hearing.

____X____ As a bargaining unit employee, you may grieve your separation following the negotiated grievance procedure in Article 25 of the collective bargaining agreement.

To assist separating employees in securing employment, the OTS will convey qualifications information to interested employers upon your request. The qualifications information you provide us may be in the form of a resume, curriculum vitae, Official Application Form for Federal Employment (OF-612), Application for Federal Employment (SF-171) or other information. This information will be disclosed to public and private employers (including Federal, State, local employment agencies, outplacement agencies and public and community services agencies). Provision of this information is voluntary. In order to have your qualifications information conveyed, a release form must be signed and submitted to the Human Resources Division. A copy of this notice may be found in the attached folder.

If you have any questions regarding this action, please contact me on (202) 906-6050.

Attachment

172

240

Standard Form 50-B
U.S. Office of Personnel Management

# NOTIFICATION OF PERSONNEL ACTION

Rev. 7/91
FPM Supp. 296-33, Subch. 4

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| OLEBARA, ROBIN C | | 03-20-1954 | 07-26-2002 |

| **ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5-A. Code 5-B. Nature of Action | | 6-A. Code 6-B. Nature of Action | |
| 304  RETIREMENT-ILIA | | | |
| 5-C. Code 5-D. Legal Authority | | 6-C. Code 6-D. Legal Authority | |
| SQM  5 U.S.C. 8336 | | | |
| 5-E. Code 5-F. Legal Authority | | 6-E. Code 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| 00005908 ADMINISTRATIVE SECRETARY II | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TG | 0318 | 12 | 00 | $ 52,776 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $ 52,776 | $ 0 | $ 52,776 | $ 0 | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| SUPERVISION - COMPLIANCE POLICY | |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Vet. Pref. for RIF |
|---|---|---|---|
| 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other<br>2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | 0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES  X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| H0 Basic + Option B(1x) + Option A | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1  CSRS | 07-06-1974 | F | 00.0 |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career Reserved | E - Exempt<br>N - Nonexempt | NONADMIN   OTS | 2000 |
| 1 | E | | |

| 38. Duty Station Code | 39. Duty Station   (City - County - State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON   DC |

| 40. AGENCY DATA | 41. | 42. | 43. Budget No. | 44. Position Sensitivity |
|---|---|---|---|---|
| | | | 02-T-000 | 05   MODERATE RISK |

### 45. Remarks

BLOCKS NUMBERS 12B THRU 12D & 20B THRU 20D ARE NOT APPLICABLE BECAUSE OTS ADMIN-
ISTERS A PAY PLAN OUTSIDE THE GENERAL SCHEDULE AS PROVIDED FOR IN P.L. 101-73.
FORWARDING ADDRESS:
PO BOX 2530 , WASHINGTON DC, 20013-2530
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
RIF NOTICE DATED: 5-06-2002 -NO OTHER WORK AVAILABLE
REASON FOR RETIREMENT: POSITION ABOLISHED

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| OFFICE OF THRIFT SUPERVISION | DIRECTOR OF HUMAN RESOURCES |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | SUE A. KENSELMAN |
| TR35 | 4039 | 07-25-2002 | |

5-Part  SC-316                                    2 - OPF Copy - Long-Term Record - DO NOT DESTROY    Editions Prior to 7/91 Are Not Usable After 6/30/93
                                                                                                    NSN 7540-01-333-6525

241

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 1

## REQUEST FOR PERSONNEL ACTION

### PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)

| 1. Actions Requested | 2. Request Number |
|---|---|
| Retirement-ILIA | 02 T 165 |

| 1a. Additional Information Call (Name and Telephone Number) | 4. Proposed Effective Date |
|---|---|
| | 7/26/02 |

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date) |
|---|---|
| | Richard M. Riccobon<br>Deputy Director, CTS |

### PART B - Preparation of SF 50 (Use only in FPM Supplement 292-1, Show all dates in month-day-year order.)

| 1. Name (Last, First Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Olebara, Robin C. | | 03-20-54 | 07-26-2002 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 304 | Retirement-ILIA | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| SQM | 5 U.S.C. 8336 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Administrative Secretary<br>#00005908 | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TG | 0318 | 12 | 00 | $52,776 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $52,776 | | $52,776 | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| SUPERVISION - COMPLIANCE POLICY | |

### EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1- None  3- 10 Point /Disability  5- 10-Point/Other | | 0- None  2- Conditional | | | |
| 2- 5-Point  4- 10-Point/Compensable  6- 10-Point/Compensable/30% | | 1- Permanent  3- Indefinite | | ☐ YES  ☒ NO |
| | 2 | | 1 | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| H0 | 9 | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1 | 7/6/74 | F | 00 |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1- Competitive Service  3- SES General | E- Exempt | | |
| 2- Excepted Service  4- Career Reserved | N- Nonexempt | NON | 2000 |
| 1 | E | | |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| | |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Education Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veteran Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | | | |

### PART C - Reviews and Approvals (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. USAF Financial Ops/EH | MWB | 9/6/02 | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

Approval I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

| Signature | Approval Date |
|---|---|

CONTINUED ON REVERSE SIDE
52-119

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239
U.S. Government Printing Office: 1995-404-763/20061

(74)

242

**PART D - Remarks by Requesting Office**

(Note to Supervisors:    Do you know of additional or conflicting reasons for the employee's resignation/retirement? If "YES", please state these facts    ☐ Yes    ☐ No
on a separate sheet and attach to SF-52.)

---

**PART E - Employee Resignation/Retirement**

### Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code.    Sections 301 and 3301 authorize OPM and agencies to issue

regulations with regard to employment of individuals in the Federal Service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary, however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due to you; and (3) any unemployment compensation benefits to which you may be entitled.

---

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

*INVOLUNTARILY RETIRED*

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, AIP Code) |
|---|---|---|---|
| ● | *Rich Wilson* | 7/19/2002 | |

**PART F - Remarks for SF-50**

M67:    Forwarding Address: Post Office  Box 2530, Washington, D.C.  20013-2530

N27:    Lump-Sum Payment For Unused Annual Leave

S51:    Employee Received RIF Notice Dated 05-06-2002

S58:    No Other Work Available

R21:    Reason for Retirement:  Position Abolished



DATE:        November 12, 2002

FROM:        Sue Rendleman
             OTS Human Resources

TELEPHONE: 202-906-6050
FAX:         202-906-6256

FROM:        Peggy L. Ryan
             EEO Investigator
             Treasury Complaint Center – Oakland

TELEPHONE: 208-761-2154
FAX:         208-922-3965

SUBJECT:     Unsworn Declaration Under Penalty of Perjury – Complaint filed by
             Robin Olebara, Case number: 02-2378TM

             In accordance with the following provisions of 28 U.S.C. 1746, I , the
             undersigned, do hereby respond to the following questions under penalty
             of perjury:

1.  State your name, title, series, grade, duty location, and race.

Sue A. Rendleman, Director of Human Resources, TG-201-25, Washington D.C.
White Female, age 49.  As a supervisor/manager since 3/86, I have never had an EEO
complaint filed against me but in my position of Director of Human Resources, I have
had to provide a number of statements concerning merit promotion issues, RIF actions,
etc.

2.  What is your supervisory relationship to the Complainant and the duration of this
    relationship? Which region did the Complainant work?

I don't have a supervisory relationship with her.  The Complainant was a Washington,
D.C. employee.

3.  Did you know the Complainant personally? Specifically, what is your role in the
    realignment decision-making process?

I know the Complainant casually.  The Washington Office is relatively small and in the
course of my HR responsibilities, I know practically everybody.

I am the Director of Human Resources and my role in the reduction-in-force was to
carryout the decisions made by top management to reorganize and realign the staff and
eliminate excess positions.



4. Please describe specifically all the events that occurred leading up to the decision to restructure. State the names and titles of individuals who were involved in those events.

A new Director, James E. Gilleran, was appointed to OTS on 12/07/2001. He decided that he immediately needed to balance the budget, eliminate unnecessary positions, duplicative functions in the Regional Offices. OTS was carrying budget deficits over the last three years totaling over $23 million and was projecting a $5 ½ million deficit in the upcoming fiscal year. Richard M. Riccobono, Deputy Director, was tasked with the assignment of balancing the budget. Since compensation and benefits comprise 75% of the OTS budget, it was determined to conduct a large-scale RIF in order to meet management objectives. As the Director of Human Resources, my role was to carry out the decision to conduct a RIF made by top management.

5. Please list the names of individuals by title, location and series who were responsible for making various decisions in the restructuring process.

James E. Gilleran, Director, Richard M. Riccobono, Deputy Director, Scott Albinson, Managing Director, Supervision. All are located in Washington, D.C. The decisions to balance the budget, centralize administrative functions in Washington, realign the Regional offices and to RIF positions were made by the Director and Deputy Director in Washington.

6. Director James E. Gilleran issued an e-mail and letter dated April 11, 2002 to all OTS Chief Executive Officers. Can you list all of the Chief Executive Officers? Were any of these CEOs affected by the restructuring? Who assisted the Director in preparing the April 11, 2002 correspondence?

The letter is addressed to CEOs of the thrift institutions we regulate. They are not OTS employees. I don't have their names. OTS realigned the regional office structure so some institutions were shifted to other Regions in the realignment. For example, institutions in New Mexico used to fall under the supervisory oversight of the Midwest Region based in Dallas. but now are supervised by the OTS West Region. I do not know who, if anyone, assisted in preparing the April 11th correspondence.

7. Please describe the OTS restructuring in detail. Describe the organization before the restructuring and then describe the "restructured" organization.

The duplicative administrative (non-examiner) functions were consolidated and centralized in Washington. In the Regions, it meant that a number of administrative positions were no longer needed. The Regional representatives and the Deputy Director jointly decided on the appropriate organizational structure for the Regional administrative units and how many positions it would need to carryout the remnant functions. Administrative functions were centralized in Washington. Regional office positions performing duplicative functions were abolished. A small unit of administrative

253

positions remains in each Regional office.  The Central Region in Chicago was abolished and the states realigned into the other four remaining regional offices.
See attached before and after organization charts.

8.  What decisions were made at the headquarters level and what decisions were made at each region?

See items 4, 5 and 7.  The decision to restructure was made in Washington by Director Gilleran and Deputy Director Riccobono.  The decision to abolish of the complainant's position was made by Scott Albinson, Managing Director, Supervision.

9.  According to the April 11, 2002 memorandum, OTS was consolidating certain administrative functions into Washington that were previously duplicated in the region; i.e. human resources, budgeting, accounting and procurement.  What impact did this have on headquarters and field offices? Were any positions or functions eliminated? Who made these decisions?

See item 4,5,7, and 8.  OTS eliminated approximately 206 positions.  Workload on the Washington offices performing administrative functions obviously increased.  Small units of administrative staff remained in the Region.  The Complainant was a Washington Office employee and therefore not impacted by the regional changes.

10. Please describe the regional realignment in detail as proposed by the April 11, 2002 memorandum (5 regions to 4 regions)

One of our five Regions, the Central Region located in Chicago, was abolished and became an area office.  See item #7.

11. Please describe the changes in each region.

See items #7 and #9.

12. Are there plans for further plans for restructuring?

There are no further restructuring plans underway.

13. Are there other employees who would be affected in the future, based on this restructuring?

Not applicable.

14. What guidance did your office provide to the field regarding the criteria to be used to determine how the restructuring was going to occur? Please provide copies of e-mail messages and copies of any other guidance that was provided by your office



My office did not issue any written guidance. However, in February, 2002, a meeting was held with the Deputy Director, Regional Directors and Deputy Regional Directors of Administration to discuss the budget deficit, the need for downsizing, the abolishment of the Central Region and the realignment of the states reporting to each Regional office and the centralization in Washington of the administrative functions. Senior management in Washington established guidance for an administrative structure and each Regional Director worked with the Deputy Director to determine how many examiners were needed in each Region/location. There were no written guidelines or e-mails issued to the Regions.

15. Please describe a Reduction in Force (RIF) and the entire process. What factors exist before a RIF can be put in place? Who is authorized to initiate a RIF?

The reduction-in-force was conducted in accordance with 5 CFR Part 351 and the OPM RIF modules as guidance. See attached regulations and OPM guidance. The Director and Deputy Director are authorized to initiate a RIF.

16. It appears that the Regions made recommendations regarding the positions that would be affected by the RIF and those recommendations were submitted to your office. What guidance did you provide the regions and what criterion was used to determine which positions would be affected by the RIF? Please provide copies of the recommendations.

See item 14.

17. Were the recommendations adopted? If not, please explain what factors were considered in the decision.

Yes. Recommendations from managers on which positions to eliminate were adopted.

18. What is a retention register and what purpose does it serve? What are the prerequisites for being listed on the register? Please provide copies of retention registers and RIF notices for the Complainant's region.

A retention register is a list of all competing employees in a competitive area in a reduction-in-force. See attached OPM regulations 5CFR 351.404 to 351.601.

19. Were there changes made to the initial retention registers and RIF notices? If so, please explain in detail why the changes were made.

No changes affecting the incumbent. Some Regions had turnover of non-affected staff and where there was a staffing need, we would rescind RIF letters. We had an instance or two where employees applied for and were competitively selected for new positions. There was an instance where an employee was incorrectly listed in Tenure Code 2 instead of Tenure Code 1. When that error was discovered, that employee was no longer within reach on a retention register and his notice was rescinded.



20. Please provide organizational charts of the OTS sectors and the restructuring

See attached charts

21. What were the factors in deciding that the Complainant would be affected by the RIF? Please be specific.

Factors included changes in workload and program emphasis in the compliance area as well as more and more technical staff are using computers, voicemail and other labor saving devices. Software programs do more and more of the work of secretaries like scheduling, word processing, grammar and spell checking). Employees prefer to manage their own schedules and OTS is less and less formal than in years past. With all of these changes, the secretarial position at OTS is becoming scarce and in many cases, like the Complainant's, is no longer a full-time job. With record budget deficits, difficult decisions had to be made by managers over which positions to cut and because of the above reasons, the Secretarial position is often the one managers feel they can do without over other technical staff. Such was the case in deciding Complainant's position could be abolished.

22. The Complainant states she should not have been terminated because of the "bump and retreat rights". Please explain what "bump and retreat" means. What criteria is used to determine who qualifies? Did the Complainant qualify for these rights? Name those individuals and positions who qualified for this action.

Bump and retreat are terms that deal with an employee's assignment rights. They are explained in the OPM modules and the RIF regulations which are enclosed. The bump and retreat rights of the Complainant were reviewed by Ms. Janios but the Complainant did not have them because there was not anyone on any retention register in a lower subgroup (bump right) nor anyone holding a position previously held by the Complainant with less service than the complainant (retreat right).

23. Please respond to all relevant allegations raised by the Complainant.

- **Complainant states that she was discriminated against on the basis of race, color, gender, age and retaliation for prior EEO activity when after her termination, she was not later offered the position of Contract Specialist that was filled by an employee outside of OTS.**

There were no improper factors in this RIF and the Complainant was terminated for reasons outlined in items 21 and 22. We did not fill the position of Contract Specialist vacated by an employee in September, 2002 and at this time, have no plans to do so. The Complainant, a TG-12 Administrative Secretary, would not have qualified for that grade or position in any event because of government-wide regulations outlining qualification requirements for contracting positions. She simply does not meet them as she has been notified of countless times.



- **Complainant alleges that OTS willfully and intentionally delayed submitting her retirement package to OPM that she completed in June 2002.**

After receiving her RIF notice, the Complainant, along with all other 200+ affected employees, was given the opportunity of going on 60 + days of administrative leave, fully paid for by the agency, as a benefit to assist affected staff in concentrating on finding new employment without having to deal with the day to day work issues. The Complainant took advantage of this as did almost every other affected employee. The Complainant called me toward the end of her administrative leave (she left me a voice mail message) stating that she had called OPM and they had not received her retirement package yet and she wanted to know why we were holding it. I asked my staff member who processes retirements, Sandy Thomas, and who had talked with the complainant several times to call her and explain that the retirement package does not go to OPM until after the effective date that the employee is "off the agency's rolls" because agencies send a SF-50 Notification of Personnel Action after it is processed off our Payroll system. Sandy Thomas, my staff member, also told her that while she is on administrative leave, as she was at the time of the call, that she is still an employee of the agency. The Complainant apparently understood this information. According to my records, the effective date of the Complainant's retirement was 7/26/02. Her retirement package was sent to OPM on August 8, 2002. While this may not be a government-wide record in terms of fastest processing times, in my experience, it would be difficult to find too many agencies that process these packages to OPM the pay period after separation, particularly with the large volume of them we had to process with over 200 RIF separations.

- **The Complainant claims that all African American females were terminated by the RIF, and no white Schedule A TG-12 secretaries were affected.**

Excepted Service (Schedule A) and Competitive Service employees do not compete with each other in a RIF. They are on separate retention registers. The secretarial positions abolished were all in the competitive service. Therefore, no Schedule A Secretarial positions were affected.

- **Complainant states that her position of Administrative Secretary was eliminated, however the unit and function of that office still exists. As a result, Ann Timbers (white, female) with less seniority was protected.**

Ann Timbers is a Secretary in the **excepted** service in another office on a different retention register. Her position has nothing to do with the Complainant's. She works in a different unit for a different supervisor. The Complainant is in the **competitive** service.

24. Please state the total number of TG-12 Administrative Secretary positions in OTS by region. What other TG-12 Secretaries were terminated due to a RIF since January 2000? If there was a difference in the treatment of the Complainant and other similarly situated employees, please explain (e.g. they were offered new positions, rehired, etc)



As of 11/11/02 the following reflects the TG-12 Administrative Secretaries in each Region:

Washington (4) Chicago (3) Atlanta (2) NY (1) SF (5) Dallas (1)

Since January 2000, there were 6 Administrative Secretaries, TG-12 separated for RIF reasons.

25. Do you have anything else to add?

The Complainant was one of approximately 206 employees who were riffed due to severe budget issues. She was an employee who received exceptional appraisals during her tenure with OTS. We were sorry to lose her along with a large number of other employees but, with such large budget deficits, we had no choice but to run a RIF. The RIF that resulted in the elimination of the complainant's position was conducted in accordance with all applicable laws, regulations, and procedures. There were no improper factors of any type in conducting this RIF.

The Complainant suggests that she was riffed due to prior EEO activity (see attached decision from the U.S. Court of Appeals). While it is true that Complainant has filed a number of EEO cases over the years, the elimination of her position was due to budget reasons and had nothing to do with protected activities.

Sue A. Rendleman — 11/18/02

Sue A. Rendleman
Director of Human Resources

258

329



**Office of Thrift Supervision**
Department of the Treasury

*James E. Gilleran*
*Director*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6590

April 11, 2002

MEMORANDUM FOR: CHIEF EXECUTIVE OFFICERS

FROM:                    James E. Gilleran

SUBJECT:                 OTS Restructuring

OTS is currently implementing a restructuring plan that will achieve greater operating efficiencies, effectiveness, and consistency of regulation for the thrift industry. The changes involve three major actions: combining supervisory resources; centralizing administrative functions; and reducing staff to match workload demands. The restructuring will result in more effective development of the examination force, and greater administrative savings. It will also mean more efficient and effective oversight by working to combine our safety and soundness and compliance exams. Further, by establishing a better method of getting feedback from you, we expect to continuously improve our service to the industry.

The thrift industry is healthy and profitable, assets are growing, and in 2001 the industry had record earnings. Changes in the composition of the industry, however, have resulted in changes in the workload requirements of OTS. OTS has continued to reduce inefficiencies and cut expenses; nevertheless, the cost reductions were not always commensurate with the loss of revenues from a consolidating industry and increases in general operating expenses. Therefore, we are consolidating certain administrative functions into Washington that were previously duplicated in each region. The areas affected are human resources, budgeting, accounting and procurement.

This has involved painful job cuts to reduce layers of management and eliminate some positions, as well as reassigning staff to other offices where their skills will be better utilized. In addition, in reviewing our regulatory workforce, we find that we are able to make modest reductions in our examination staff to keep pace with industry consolidation without adversely impacting our regulatory effectiveness.

I believe that the result of our restructuring program will be a stronger, more effective regulating agency for our nation's savings associations. Improvements in the structure of OTS and in the



334

Page 2

examination process will mean more effective oversight of the industry combined with less regulatory burden on your institutions. It will also place OTS on a sound financial footing by balancing the budget without raising assessments.

We have also realigned the agency's regional structure. After a careful review of our operations, we determined that our supervisory obligations could be effectively met with four supervisory regions, rather than five. Therefore, supervisory responsibilities for the institutions in the states that made up the former Central region have been reassigned among the other regions. OTS will maintain a Chicago office with a substantial supervisory presence.

The Southeast region has assumed oversight of thrifts in Michigan, Illinois, Indiana, and Kentucky. The Midwest regional office now covers thrifts in Wisconsin and Tennessee, and Ohio will be added to the Northeast region. In addition, North and South Dakota, Colorado, and New Mexico will be transferred to the Western region from the Midwest region as part of the realignment.

We are committed to vigorous and progressive oversight of your industry. We are beginning the process of cross-training our examiners to get them fully accredited in both the safety and soundness and compliance disciplines. Many of our examiners already hold dual accreditation and broad professional development in all aspects of the financial services industry will continue to be strongly encouraged. Cross-training and full accreditation will result in the cultivation of a highly skilled workforce that can adapt as your industry evolves.

While a combined safety and soundness and compliance examination is in the process of being developed, we will continue to perform our examinations in the same way as in the past. As financial products and distribution of financial services have evolved, a focused approach is required in order to yield the best regulatory result. We plan to test the combined examination approach on a limited number of institutions utilizing a pilot program. As we gain valuable experience during this pilot period, we will assess the program's effectiveness and make adjustments accordingly. Our intent is to expand the pilot program gradually to phase in the new comprehensive examination program throughout the thrift industry. Melding the safety and soundness and the compliance examinations together will ensure that compliance issues do not compromise safety and soundness and that safety and soundness standards do not undermine compliance requirements. This will provide a clearer representation of the operations of each institution, and ensure that all regulatory objectives are consistently met. In addition to the cross-training of examiners, we will continue to maintain a cadre of compliance experts, both in the regions and in Washington, to assist examiners in handling particularly difficult, complex or technical compliance-related matters.

I wish to emphasize that I view compliance as a vital and integral aspect of an institution's business. Poor compliance is as serious a safety and soundness issue as, for example, weak underwriting standards or weak internal controls. I expect institutions to view compliance risks in the same light as other operational risks. Later this spring we will be sending all institutions a



Page 3

compliance self-assessment questionnaire to help them determine their compliance on an ongoing basis and for use by our examiners for comparative purposes.

In order to ensure that OTS continues to provide the highest possible level of service and oversight to the industry, we have also updated our management survey of CEOs. This voluntary survey will be conducted annually, beginning this summer, and will replace the survey that was previously sent to you at the completion of each examination cycle. The feedback generated by the attached sample Annual Thrift Satisfaction Survey will help us to further refine the examination process, in order to maintain the strength and health of both OTS and the thrift industry.

Thank you for your continued support of the OTS and the thrift charter during this transition period. If you have any questions regarding this memo, please do not hesitate to contact me.



FINAL AGENCY DECISION IN THE
DISCRIMINATION COMPLAINT OF:

ROBIN OLEBARA and
JOHN W. SNOW,
SECRETARY OF THE TREASURY

CASE NUMBER:                            TD 02-2378TM

## INTRODUCTION

This is the final agency decision on the complaint filed by Robin Olebara on
August 15, 2002, alleging discrimination by the Office of Thrift Supervision (OTS)
because of race, color, sex, age, or retaliation concerning a reduction in force (RIF) and
other matters.

## PROCEDURAL CHRONOLOGY

| | |
|---|---|
| May 6, 2002 | The OTS issued a Specific Notice of RIF to the Complainant. |
| June 12, 2002 | The Complainant contacted an Equal Employment Opportunity (EEO) counselor. |
| July 26, 2002 | The Complainant's retirement became effective. |
| Aug. 3, 2002 | The Complainant received the Notice of Right to File a Discrimination Complaint. |
| Aug. 15, 2002 | The Complainant filed a formal complaint by mail. |
| Sep. 17, 2002 | The Oakland Treasury Complaint Center (OTCC) asked the Complainant for information about the timeliness of the complaint. |
| Sep. 30, 2002 | The Complainant sent a letter concerning timeliness and raised a new allegation. |
| Oct. 8, 2002 | The OTCC issued an acceptance letter, identifying the allegations and stating that the mixed case complaint procedures were applicable. |
| Jan. 13, 2003 | The OTCC sent the Investigative File (IF) to the Complainant for review. |
| Feb. 24, 2003 | The OTCC added the Complainant's comments and an exhibit to the IF, stated that the IF was complete, and advised the Complainant that the Office of Equal Opportunity Program would issue a final agency decision on this mixed case complaint. |

A final agency decision will now be issued in accordance with 29 CFR §1614.302(d).

## ISSUES

The issues accepted for investigation were whether the Complainant was discriminated against because of race (African American), color (dark complexion), sex (female), age (48), or retaliation (prior EEO activity) when the agency:

1. terminated her employment, effective July 27, 2002, as a result of a RIF,

2. delayed submitting her retirement package to the Office of Personnel Management (OPM), and

3. after her termination, did not offer her a position vacated by a White male employee.

## MIXED CASE REVIEW

Civilian employees in Executive agencies may generally appeal RIF's resulting in separations to the Merit Systems Protection Board (MSPB).  5 CFR §351.202(a)(1) & §351.901, and *Losure v. ICC*, 2 M.S.P.R. 361 (1980).  A nonfrivolous allegation of the involuntariness of a retirement or resignation is required to establish an appealable jurisdictional issue for MSPB. *Burgess v. MSPB*, 758 F.2d 641 (Fed. Cir. 1986).  An allegation that the Complainant was forced to retire due to a RIF is thus a matter appealable to MSPB, and we agree that the discrimination complaint on this matter is a mixed case complaint.  29 CFR §1614.302(a)(1).

The second and third issues do not directly involve appealable matters.  The question is whether it is proper to treat them as mixed case allegations to be decided along with the retirement or termination issue.  This can be a difficult decision to make; see generally, the section on mixed cases involving multiple personnel actions in *A Guide to Federal Sector Equal Employment Law & Practice*, Ernest C. Hadley (Dewey, 2001 ed.), at page 1332 and following.  When matters are inextricably intertwined or linked to an appealable action, those matters are properly considered to be part of the mixed case complaint on the appealable action, for example, see *Goins v. TVA*, No. 05931007 (EEOC 1994) (surplus status inextricably intertwined with a RIF), and *Marchini v. Dep't of Agriculture*, No. 05930880 (EEOC 1994) (evaluation and a performance improvement plan inextricably linked to removal).

The retirement delay issue concerns the propriety of management's processing of the retirement caused by the RIF, and the job offer issue concerns the propriety of management's handling of a vacancy occurring soon after the RIF.  We believe that these matters are inextricably linked to the RIF action, and thus it appears necessary to decide these allegations in connection with the mixed case complaint.  Even if they were not considered to be inextricably linked to the RIF, it is not feasible to separate out

these issues, especially since they involved some of the same managers and occurred in approximately the same time frame as the RIF action.

## STATEMENT OF FACTS

The Complainant was an Administrative Secretary II, TG-0318-12,[1] in the Office of Supervision, Compliance Policy, OTS, in Washington, D. C., when she received a May 6, 2002 memorandum, subject: Specific Notice of RIF, stating that she would be separated on July 26, 2002, due to a RIF conducted due to budgetary constraints. The Complainant then submitted a retirement application, and it was effective on July 26, 2002. Notice of Personnel Action. IF, Exhibits 10 & 11.

RIF

The Complainant has contended that she was discriminated against because of her race, color, sex, or age, or in retaliation for her prior EEO complaints, when her position was abolished due to the RIF and she was forced to retire in lieu of being separated. The Complainant has identified herself as African American, dark complexioned, female, and 48 years old, and stated that she had previously filed discrimination complaints.

The Complainant stated: "[Y]ears ago, I was told because of my race and dark complexion, I would not progress at the agency (i.e., advance/receive equal employment opportunities provided to others, especially whites and white complexion African Americans)." Complaint. Ex. 1, p. 2. There are no other references to color discrimination or to disparate treatment of the Complainant in comparison with employees who are identified as Black but with lighter complexions. Most of the contentions of discrimination focus on race and sex discrimination against Black or African American females. In support of these claims, the Complainant provided documents from prior complaints and grievances: (1) an unsigned, June 1991 affidavit from an earlier complaint, alleging race discrimination and retaliation with regard to a reorganization and advancement opportunities, (2) a September 10, 1993 arbitrator's decision concerning a 1991 rating, with no mention of discrimination, (3) a mid-1990's Statement on Class Action Issues, involving discrimination against Black females in performance ratings, with adverse effects on promotions and RIF's, (4) an undated and unsigned appeal prepared in 2000, on an Administrative Judge's decision concerning matters touching on a 1995 RIF and advancement actions favoring White employees, and (5) an undated Complainant's Reply on the 1995 RIF matter, which discusses a selection of James Harden for a Contract Specialist position. Ex. 4, p. 56-100.

The Complainant explained that but for the lack of promotions, the questionable reorganizations, denial of opportunities, violations of RIF procedures, and OTS promotion and advancement policies, she would have been eligible to "bump and

---

[1] These letters and numbers identify the OTS pay plan, series, and grade for the Complainant's position. The Complainant noted that this position is equivalent to a GS-5 (or GS-0318-05) in the General Schedule pay system. Ex. 4, p. 36.

retreat" into the jobs that she once held, such as those held by Mr. Harden and others. Ex. 4, p. 43-44. Mr. Harden is a White, 44 year old, Senior Contract Specialist, TG-19. Ex. 16, p. 206.

In addition to Mr. Harden, the Complaint referred to a number of other individuals to support her claim. She said that functions of the abolished Administrative Secretary job were transferred to Ann Timbers and Semy Jenkins. Ex. 4, p. 38. Both are in Administrative Secretary II positions; Ms. Timbers is White and 43 years old, while Ms. Jenkins is Black and 53. Ex. 16, p. 229 & 230.

The Complainant made no specific contentions of age discrimination. As to retaliation, the Complainant noted that she had filed a complaint in January 1989 about a questionable reorganization and later amended it to include more years of abusive practices and personnel violations. She also said that a judge had issued a December 2001 summary judgment decision that accepted the agency's position and that it "… provided the agency the approval to 'do their will,' a 'catch me if you can' philosophy, thus, in 2002, the RIF … ." Affidavit, Ex. 4, p. 40.

The Director of Human Resources stated that the Complainant was one of 206 employees who were RIF'd in 2002. Ex. 18, p. 258. In the Compliance Policy unit, eight positions remained after the RIF, and the four lowest-graded positions were abolished: a TG-16 Program Analyst, a TG-12 Assistant Program Analyst, a TG-12 Program Analyst (Trainee), and a TG-12 Administrative Secretary II (the Complainant's position). All were female; two were Black and two were White, and their ages were 41, 48, 50 (the Complainant), and 52. Work Unit List, Ex. 15, p. 202.

A Retention Register for Administrative Secretaries, in the Complainant's competitive area, grade, and competitive level, lists five persons, with handwritten notations that the positions of the Complainant and two others had been abolished. The other two employees on the list had earlier service computation dates for RIF purposes. Ex. 4, p. 55. A pre-RIF OTS employee list shows that the three employees who were RIF'd were 48 or 49 year old Black females, while the two who remained with OTS after the RIF were 54 and 63 year old White females. Ex. 16, p. 205, 207, 208 & 229. A "Washington RIF List" identifies 12 employees who were separated: The incumbents of the abolished positions were all female; eight were Black and four were White; ten of the 12 were more than 40 years old; and only the Complainant had prior EEO activity. Ex. 15, p. 201.

The OTS Deputy Director (Caucasian, male, age 44) stated that the Director had been very concerned about the agency's budget deficits and told him to balance the budget, so the regional offices were realigned and a RIF was conducted. He said that several years ago he had met with the Complainant and her attorney to attempt to settle an EEO complaint. Ex. 5. The 2000 and 2001 Financial Reports show that expenses exceeded revenues by $13,073,000 and $1,082,000 in those years. Ex. 5, p. 116 & 135.

The Managing Director, Supervision (White, male, age 43, asserting no knowledge of the Complainant's EEO activity), stated that managers were told to identify positions that could be eliminated without losing the effectiveness of the agency and to re-engineer the work of those positions for distribution to other employees. He identified three analyst positions and the secretarial position for abolishment. Ex. 6. The Compliance Policy Director (White, male, age 50, a deponent in a prior complaint filed by the Complainant), the Complainant's first level supervisor, stated that he did not select the positions to be eliminated. Ex. 7.

The Program Manager for Staffing and Outplacement (White, female, age 53, provided information to investigators of prior complaints) stated that she was responsible for ensuring that the RIF was conducted in accordance with applicable laws and regulations[2] and that she summarized the Individual Employment Record for the Complainant and explained to the Complainant that she had no bumping rights because there was no employee in a lower tenure and subgroup whom she could displace and no retreat rights because there were no employees with lower retention standing occupying positions she had previously held. Ex. 8 & Ex. 4, p. 54.

The Director of Human Resources (White, female, age 49, acknowledged that Complainant has filed a number of complaints) stated that the Complainant did not have bump and retreat rights, for the same reasons mentioned by the Program Manager. The Director noted that the Complainant did not compete with Ms. Timbers, another Secretary, because Ms. Timbers was in the excepted, rather than the competitive, service, and therefore was on a different retention register. She stated that there were no improper factors in the RIF and the Complainant was terminated for reasons related to workload, emphasis on the compliance program, and the use of technology by the remaining employees. Ex. 18.

<u>Delay in Submitting Retirement Package</u>

The Complainant signed a retirement application on June 12, 2002. Ex. 9, p. 169(7). The effective date of the retirement was July 26, 2002. Ex. 9, p. 169(1). The retirement package letter to OPM was dated July 26, 2002, and the office copy had a handwritten notation: "Sent to OPM ... 8/8/02 #808078101937." Ex. 9, p. 169. There are eight work days between Friday, July 26, and Thursday, August 8, 2002. The Benefits Specialist (Black, female, age 49) stated that, in a RIF situation, a retirement package could not be processed until the person came off the payroll because RIF's sometimes were canceled before the retirement date. She also said that, since the Complainant had expressed concerns to her about receiving an annuity, she went out of her way to

---

[2] The Federal RIF regulations are codified at 5 CFR Part 351. Retention standing, competitive area, and competitive level are discussed in Subpart D, Scope of Competition, §351.401 - §351.404. Ex. 18, p. 274-324. RIF rules are complex, and OPM has issued a Restructuring Information Handbook to assist human resources offices in administering RIF actions. Ex. 18, p. 330-612. OPM has also issued an Employee's Guide to RIF, October 1999, which explains in simplified language how RIF's are conducted. Ex. 18, p. 613-627.

ensure that the package would be submitted at the earliest possible date, and it was about the first she sent to OPM.  Ex. 9.

<u>Position Offer</u>

The Complainant identified the White male employee who vacated a position as Mr. Harden, who transferred to another agency, and she mentioned earlier matters concerning his on-the-job training and an alleged 1998 pre-selection for a job for which she had previously qualified. The Complainant said she believed discrimination was a factor in the decision not to offer her the position, in that there had been deliberate and improper adverse actions and acts of aggression taken against her by OTS managers to abolish her equal employment opportunities as a Federal worker and there did not appear to be any other reason for not offering the position. Ex. 4, p. 46 - 47.

As previously noted, Mr. Harden had been a Senior Contract Specialist with OTS. He was no longer an employee at the time of the August 15, 2002 list. Ex. 17. The Director of Human Resources stated that they did not fill a Contract Specialist position vacated by an employee in September 2002, and there were no current (November 2002) plans to do so. She also stated that the Complainant did not meet the qualifications requirements, "as she ha[d] been notified of countless times." Ex. 18, p. 256.

**STANDARDS OF ANALYSIS**

This case involves allegations of disparate treatment, that is, that the agency treated the Complainant less favorably than others because of the Complainant's membership in protected groups. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). The Supreme Court developed a standard of analysis in the case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is applied in making determinations regarding alleged discriminatory treatment in disparate treatment cases. Under the *McDonnell Douglas* standard, the Complainant has the initial burden of establishing that there is some substance to his or her allegation of discrimination. In order to accomplish this burden, the Complainant must establish, by a preponderance of the evidence, a *prima facie* case -- that is, a body of evidence such that, were it not contradicted, the inference may be made that there was discrimination. A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 CFR §1201.56(c)(2). The establishment of a *prima facie* case is not sufficient in and of itself to support a finding of discrimination; rather, it simply allows an inference of discrimination.

The standard for establishing a *prima facie* case is not a rigid one and must vary depending on the circumstances in each case. *McDonnell Douglas*, *supra*. To establish a *prima facie* case of race, color, or sex discrimination, the Complainant must show that (1) he or she is a member of a protected group; (2) he or she suffered an adverse action; and (3) a similarly situated employee not in his or her protected group was

treated more favorably. *See McDonnell Douglas, supra.* Absent comparative evidence, the Complainant may establish a *prima facie* case of discrimination by setting forth sufficient evidence, which if otherwise unexplained, would reasonably give rise to an inference of discrimination. *Goddard v. Dep't. of the Treasury*, EEOC Request No. 05910124 (1991), *citing Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978).

The major allegation in this complaint concerns an abolishment of a position due to a RIF. As stated in *A Guide to Federal Sector Equal Employment Law & Practice, supra*, at p. 1260:

> Allegations that an agency has discriminated against an employee in a RIF or reorganization are analyzed under *McDonnell Douglas [Corp.] v. Green*, 411 U.S. 792 (1973). The employee must first establish a *prima facie* case by showing that he is a member of a protected group and was treated less favorably in the RIF than similarly situated employees outside of his protected group. The agency rebuts a *prima facie* case … by demonstrating that the RIF was based on proper management considerations … . *Morris v. Dep't of the Army*, EEOC No. 03820045 (1983). The employee then has the opportunity to show that the RIF was a pretext for prohibited discrimination.

The evidentiary framework developed in the context of Title VII cases has been found to be applicable to proceedings under the Age Discrimination in Employment Act (ADEA). *Elwood v. Pina*, 815 F.2d 173, 176 (1st Cir. 1987*); Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342-3 (D.C.Cir. 1983), *cert. denied*, 464 U.S. 994 (1983); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014-16 (1st Cir. 1979). In cases other than nonselections, a *prima facie* case of age discrimination may be established by demonstrating that (1) the Complainant was in the protected age group and that (2) he or she was treated differently from other similarly situated employees who were not of the protected group. *Hammer v. U.S. Postal Service*, No. 01892982 (EEOC 1998).

A *prima facie* case of reprisal requires that the Complainant show that (1) he or she engaged in a protected activity (*i.e.*, participated in the EEO process or opposed discriminatory practices); (2) the agency was aware of the protected activity; (3) he or she was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (4) there is a causal connection between the protected activity and the adverse action. *Hochstadt v. Worcester Found. for Experimental Biology*, 425 F. Supp. 318 (D. Mass.), *aff'd*, 545 F.2d 222 (1st Cir. 1976). In order to establish a causal link between the adverse employment action and engagement in protected activity, the Complainant must demonstrate either (1) direct evidence of causation or (2) knowledge coupled with closeness in time that creates an inference of causation. *Parnell v. West*, 114 F.3d 1188 (6th Cir.)(unpub.). Temporal proximity alone, however, "will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id., citing Cooper v. City of North Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986); *Causey v. Balog*, 162 F.3d 795 (4th Cir. 1998).

Once a *prima facie* case has been established, management has the burden of dispelling the inference from the *prima facie* case by articulating legitimate,

nondiscriminatory reasons for its actions. *Furnco, supra*. To rebut the *prima facie* case, the agency must provide an explanation sufficient that, if not later shown to be pretextual, the inference raised by the *prima facie* case would fall. In addition, the reasons must be sufficiently clear and specific that the complainant will have a fair opportunity to demonstrate pretext. This is not a burden of persuasion, which at all times remains with the complainant, but rather a burden of production -- to "clearly set forth, through the introduction of admissible evidence, the reasons for [its employment decision]." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-256 (1981).

With respect to an allegation of age discrimination, the Complainant must also demonstrate that age was a causative factor in the adverse employment action, in the sense that, but for the employer's motive to discriminate on the basis of age, the adverse employment action would not have occurred. See *Loeb, supra.* That additional causative element, beyond what is required in Title VII cases, is required because age, as various courts have noted, is not an immutable and unchanging characteristic as are the bases of discrimination prohibited under Title VII. See, for example, *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975).

Once management has articulated legitimate, nondiscriminatory reasons for its actions, the Complainant has the burden to prove, by a preponderance of the evidence, that the reasons given by management for its actions were not the true reasons but a pretext for discrimination. The complainant can establish pretext either directly by showing a discriminatory reason more likely motivated management, or indirectly, by showing that the reasons given for management's actions are simply not believable. *Burdine*, 450 U.S. at 253. Generally, the complainant may show pretext, among other ways, either by presenting direct evidence of discriminatory statements or the past personal treatment of the complainant, or by using comparative evidence, such as statistics of management's employment practices or evidence that management departed from its normal policy. At that point, the trier of fact must decide which party's explanation of the employer's motivation it believes. *U.S. Postal Service v. Aikens*, 460 U.S. 711, 716 (1983). "But a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

**FINDINGS AND ANALYSIS**

<u>RIF</u>

The Complainant is a member of protected groups by virtue of her race, color, sex, age, and the prior EEO complaints she had filed. The action to separate the Complainant due to a RIF constituted an adverse employment matter. The question at this point is whether employees who were not in her protected groups and who were in similar RIF situations were treated in a more favorable manner.

There were five persons on the retention register for Administrative Secretary II. The list did not include Ms. Timbers, a White person in this position who was not RIF'd, but

the testimony of the Director of Human Resources indicated that Ms. Timbers was on a different, excepted service register, and we find that she was not similarly situated. However, the record shows that two Administrative Secretary II positions remained after the RIF, and the two employees on the register who remained with OTS were both White, while the other three were Black. We find that this is a sufficient basis for a finding of a *prima facie* case of race discrimination.

There is no allegation or evidence tending to show disparate treatment on the basis of color, to the extent that it is considered separately from race, and thus a *prima facie* case of color discrimination has not been established. All of the persons on the retention register with the Complainant were female, and the two oldest were retained. We find that a *prima facie* case has not been established on the bases of sex or age.

As for retaliation, we must determine whether the agency was aware of the Complainant's protected activity and whether there was a causal connection between that activity and the RIF. Some of the management officials involved in the RIF stated that they were aware that the Complainant had filed complaints, but the Managing Director who identified her position for abolishment stated that he was unaware of her complaint involvement and there is no evidence to the contrary. The Deputy Director of OTS and the two Human Resources officials evidently were the persons who had some influence over the number of particular types of positions to abolish. The evidence shows that they were aware of prior complaints, but there has been no showing of any direct involvement with those complaints, any evidence of a motive to retaliate, or any substantive connection with the complaints. Therefore, we find that a *prima facie* case of retaliation has not been established.

We did find that a *prima facie* case of race discrimination had been established. Management has provided a legitimate, nondiscriminatory reason for the RIF and the abolishment of the Complainant's position in the form of the statement from the Deputy Director of the need for a smaller work force due to budgetary considerations, and this has been buttressed by two annual reports showing that agency expenses exceeded revenues.

The Complainant now has the opportunity to show that the stated reason was a pretext for discrimination. The Complainant referred to complaints she had filed concerning earlier reorganizations, RIF's, and other agency actions, and stated that these actions affected her advancement opportunities, specifically as to what work qualifications and experience she had and what position she encumbered at the time of the RIF, thus resulting in her separation, instead of her being able to be reassigned to a different position under the bump and retreat rules in the RIF regulations. Those matters undoubtedly had an effect on her employment, but they are not before us for adjudication here, and there has been no evidence presented which relates to these matters and which tends to show that the abolishment of the position and the separation decision were taken for racially-discriminatory reasons, rather than for the budgetary reasons advanced by management.

### Delay in Submitting Retirement Package

The Complainant's retirement package was mailed to OPM on the ninth working day after the date on which the retirement became effective. There is no allegation or evidence that the Benefits Specialist took more time than usual in processing this package or that she deviated from a policy of processing the applications only after a person left the personnel rolls of the agency. Moreover, the Specialist averred that she made a special effort to process the package quickly in response to the Complainant's concerns about receiving an annuity. We find that a *prima facie* case of discrimination has not been established on any basis, that management provided a legitimate, nondiscriminatory reason for the manner in which the package was processed, and that no evidence of pretext has been presented.

### Position Offer

The Complainant discussed the employment situation of Mr. Harden, primarily with regard to alleged preferential treatment of him in earlier years, but she also contended that the agency did not offer her the position he vacated when he went to another agency after the RIF. Federal managers have many options for getting the work of a departed employee done, such as reassigning the work to the remaining employees or, if they can fulfill the budgetary and human resources requirements, filling the vacancy. The Director of Human Resources said management had no plans to fill the position vacated by Mr. Harden, and there is no evidence which would lead one to infer that this decision was done to avoid re-employing the Complainant. We find that management did not make an employment decision that affected the Complainant, and thus we find that a *prima facie* case has not been established on any basis. Moreover, the record shows that the Complainant was not qualified for this position.

We also note that the Specific Notice of RIF indicates that the Complainant was entitled to enroll in the Career Transition Assistance Program and the Priority Placement Program. These programs are designed to help an employee fill announced vacancies within the agency both before and after separation. Enrollment in these programs is an effective way for an employee affected by a RIF to find a new position within the agency.

## DECISION

In view of the foregoing, it is the decision of the Department of the Treasury that a finding of no discrimination is appropriate in this matter. The Complainant is not entitled to relief.

## NOTICE OF APPEAL RIGHTS FOR MIXED CASES

If you are dissatisfied with this decision, you are entitled to file a civil action in an appropriate United States District Court, OR, you may first file an appeal with the Merit

TD 02-2378TM – Robin Olebara                                              11

Systems Protection Board (MSPB), but **NOT** with the Equal Employment Opportunity Commission (EEOC).

All time periods are given in *calendar* days. If a time period expires on a Saturday, Sunday or Federal holiday, you may file on the next business day. If you are represented by an attorney, the time periods begin to run from the date your attorney receives this decision.

## FILING AN APPEAL WITH THE MSPB

If you choose to appeal this decision to the MSPB, you must file your appeal *within 30 days* of the date you receive this decision with:

**CHIEF ADMINISTRATIVE JUDGE**
**MERIT SYSTEMS PROTECTION BOARD**
**WASHINGTON D.C. REGIONAL OFFICE**
**1800 DIAGONAL ROAD**
**SUITE 205**
**ALEXANDRIA, VA 22314-2840**
**FAX (703) 756-7112**

Enclosed is a form that you may use to file your appeal. You may file an appeal by mail, facsimile transmission or personal delivery.

## FILING A CIVIL ACTION

You may file a civil action in an appropriate United States District Court *within 30 days* from the date you receive this decision unless an appeal is filed with MSPB.

You may also file a civil action *after 120 days* from the date you file an appeal with MSPB if MSPB has not issued a decision.

You must also comply with the following instructions:

(1) You must name JOHN W. SNOW, SECRETARY OF THE TREASURY as the defendant. Failure to provide his name and official title may result in dismissal of your case.

(2) If you decide to file a civil action and if you do not have, or cannot afford, the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action must be filed within 30 days of the date you receive the agency or MSPB decision.

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

| | |
|---|---|
| ROBIN C. OLEBARA,<br>Appellant, | DOCKET NUMBER<br>DC-0752-03-0528-I-1[1] |
| v. | |
| DEPARTMENT OF THE TREASURY,<br>Agency. | DATE: July 31, 2003 |

Robin C. Olebara, Washington, D.C., pro se.

Randy W. Thomas, Esquire, Washington, D.C., for the agency.

**BEFORE**
Raphael Ben-Ami
Administrative Judge

**INITIAL DECISION**

The appellant timely appealed from the final agency decision on her formal discrimination complaint, wherein the agency found that the appellant was not retaliated against for her prior equal employment opportunity activity and/or discriminated against on the basis of her race, color, sex, or age and thereby forced to retire because of a reduction in force (RIF). The appellant did not request a hearing, and I therefore decided this appeal based on the parties' written

---

[1]   The docket number has been changed from DC-0351-03-0528-I-1 to DC-0752-03-0528-I-1.

submissions.[2]  For the following reasons, the appeal is DISMISSED for lack of jurisdiction.

## JURISDICTION

### Burden of proof/legal standard

The Board's jurisdiction is not plenary, but is limited to those areas specifically granted by some law, rule, or regulation. *See* 5 U.S.C. § 7701(a); *Todd v. Merit Systems Protection Board*, 55 F.3d 1574, 1576 (Fed. Cir. 1995). Thus, the Board does not have jurisdiction over all actions that are alleged to be incorrect. *See, e.g., Weyman v. Department of Justice*, 58 M.S.P.R. 509, 512 (1993).

The appellant bears the burden of establishing by preponderant evidence that the Board has jurisdiction over her appeal. *See* 5 C.F.R. § 1201.56(a)(2). Preponderance of the evidence is defined by regulation as the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. *See* 5 C.F.R. § 1201.56(c)(2).

### The appellant has not established that the Board has jurisdiction over her appeal.

The appellant was employed as an Administrative Secretary with the agency's Office of Thrift Supervision until she retired, effective July 26, 2002, prior to being separated by RIF. *See* Appeal File (AF), Tab 6, Subtab 4H. The appellant alleges that she was forced to retire due to the impending RIF action, which she claims was discriminatory.

Resignations and retirements are presumed voluntary. *See Terban v. Department of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000).  In order to overcome the presumption that a resignation or retirement was voluntary, an

---

[2]  The Board may properly consider the agency's evidence, as well as the appellant's, in determining whether the appellant has made nonfrivolous allegations of jurisdiction. *See Dorrall v. Department of the Army*, 301 F.3d 1375, 1380 (Fed. Cir. 2002).

employee must show that: (1) The resignation or retirement was the product of misinformation or deception by the agency; or (2) the resignation or retirement was the product of coercion by the agency. *See id.* In order to establish involuntariness on the basis of coercion, an employee must show that the agency effectively imposed the terms of the employee's resignation or retirement, that the employee had no realistic alternative but to resign or retire, and that the employee's resignation or retirement was the result of improper acts by the agency. *See id.* (citing *Staats v. U.S. Postal Service*, 99 F.3d 1120, 1124 (Fed. Cir. 1996)). An involuntary resignation or retirement is tantamount to a removal and is subject to the Board's jurisdiction. *See Murray v. U.S. Postal Service*, 68 M.S.P.R. 177, 179 (1995).

The common element in all cases where the Board and the courts find an involuntary resignation or retirement is that factors have operated on the employee's decision-making processes that deprived him or her of freedom of choice. *See Heining v. General Services Administration*, 68 M.S.P.R. 513, 519 (1995). The determination of whether the employee was effectively deprived of free choice is based on the totality of the circumstances. *Id.* at 519-20.

Because it appeared that the Board might not have jurisdiction over this matter, I issued an Order to Show Cause, specifically explaining the nature of the jurisdictional issue and the appellant's burden of proof, and providing her with an opportunity to submit evidence and argument to prove that this matter is within the Board's jurisdiction. *See* AF, Tab 3. The appellant did not respond to the jurisdictional issue. The agency responded, and asked that the appeal be dismissed for lack of jurisdiction because the appellant's retirement was voluntary. *See id.*, Tab 6, Subtab 1 at page 10; Tab 7.

The record shows that the agency issued the appellant a "Specific Notice of Reduction in Force" on May 6, 2002, advising her that she would be separated from the Office of Thrift Supervision, effective July 26, 2002, due to a RIF that was being conducted based on "budgetary constraints." AF, Tab 1, attachment to

appeal; Tab 6, Subtab 4J. The appellant was further advised that she was entitled to discontinued service retirement and that she "may resign at any time after receipt of this notice and [her] resignation may be effective on the date [she] specif[ied] or on the separation date." *Id.* The appellant thereafter filed an "Application for Immediate Retirement" on June 12, 2002. *See id.*, Subtab 4I.

The appellant alleges that she "involuntarily retired" as a result of a RIF which was improper and discriminatory because it targeted her position, denied her "bump and retreat" assignment rights, and gave unwarranted preference to other individuals through promotions and offers of compensation. *See* AF, Tab 1, Board Appeal Form and attachments thereto. The appellant adduced no evidence to support any of these claims.

Employees who voluntarily leave their positions in advance of an imminent RIF do not suffer an appealable adverse action. *See Knight v. Department of Defense*, 332 F.3d 1362, 1368 (Fed. Cir. 2003) (citing *Krizman v. Merit Systems Protection Board*, 77 F.3d 434 (Fed. Cir. 1996); *Mueller v. U.S. Postal Service*, 76 F.3d 1198 (Fed. Cir. 1996)). Further, it is well established that the fact that an employee is faced with an inherently unpleasant situation or that her choices are limited to unpleasant alternatives does not make her decision involuntary. *See Lawson v. U.S. Postal Service*, 68 M.S.P.R. 345, 350 (1995). Thus, a decision to resign or retire rather than be removed, without more, does not amount to coercion. *See Lamb v. U.S. Postal Service*, 46 M.S.P.R. 470, 474 (1990) (citing *Schultz v. Department of the Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)).

However, a resignation or retirement to avoid a threatened removal may be considered coerced if the employee can show that the agency had no reasonable grounds for threatening to take the removal action. *See Lamb*, 46 M.S.P.R. at 475. In other words, if the appellant can show that the agency knew that the reasons for the threatened removal could not be substantiated, the action would be purely coercive and would render her resulting resignation or retirement involuntary, her appeal within the Board's jurisdiction, and entitle her to

reinstatement. *See Barthel v. Department of the Army*, 38 M.S.P.R. 245, 251 (1988). To make this showing, the appellant must do more than merely rebut the agency's reasons for the threatened action. *See id.*

The agency submitted evidence showing that its Office of Thrift Supervision conducted the RIF in question in accordance with applicable laws and regulations and that it gave the appellant all of her entitlements in that regard. *See AF*, Tab 6, Subtabs 4C, 4D, 4K. The evidence further shows that the RIF was conducted for the legitimate reasons of meeting reduced workload demands and achieving a balanced budget. *See id.*, Subtabs 4D, 4L, 4M.

The appellant has not shown that the agency knew that the reasons for her threatened separation by RIF could not be substantiated. Nor has she described any other event which rises to the level of coercion necessary to overcome the presumption of voluntariness. *See Terban*, 216 F.3d at 1025 (citing *Staats*, 99 F.3d at 1124) (the doctrine of coercive involuntariness is a narrow one). Accordingly, because the appellant has identified no circumstances surrounding her decision to retire that might reflect any deprivation of free choice on her part, she has failed to establish that the Board has jurisdiction over her appeal and this appeal therefore must be dismissed.

## DECISION

The appeal is DISMISSED.

FOR THE BOARD:

_____

Raphael Ben-Ami
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **September 4, 2003**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if this initial decision is

received by you more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit.  The paragraphs that follow tell you how and when to file with the Board or the federal court.  These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.  Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC  20419

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  Your petition must be postmarked, faxed, or hand-delivered no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision.  If you fail to provide a statement with your petition that you have either mailed, faxed, or hand-delivered a copy of your petition to the agency, your petition will be rejected and returned to you.

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

The United States Court of Appeals
for the Federal Circuit

717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be _received_ by the court no later than 60 calendar days after the date this initial decision becomes final.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent by regular mail, unless otherwise indicated, this day to each of the following:

Appellant

Robin C. Olebara
Post Office Box 2530
Washington, DC  20013

Agency's Representative, BY FAX

Randy W. Thomas, Esq.
Office of Thrift Supervision
Department of the Treasury
1700 G Street, NW., 5th Floor
Washington, DC  20552
Facsimile No.:  (202) 906-6260

Other

Kenneth L. Bates
U.S. Office of Personnel Management
Employee Relations Division
1900 E Street, NW., Room 7412
Washington, DC  20415

July 31, 2003
(Date)

Alva M. Bunaugh
Paralegal Specialist

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD

ROBIN C. OLEBARA,
        Appellant,

    v.

DEPARTMENT OF THE TREASURY,
        Agency.

DOCKET NUMBER
DC-0752-03-0528-I-1

DATE:  JUL 3 0 2004

    Robin C. Olebara, Washington, D.C., pro se.

    Randy W. Thomas, Esquire, Washington, D.C., for the agency.

**BEFORE**

Neil A. G. McPhie, Acting Chairman
Susanne T. Marshall, Member
Acting Chairman McPhie issues a separate concurring opinion.

**FINAL ORDER**

    The appellant has filed a petition for review in this case asking us to reconsider the initial decision issued by the administrative judge. We grant petitions such as this one only when significant new evidence is presented to us that was not available for consideration earlier or when the administrative judge made an error interpreting a law or regulation. The regulation that establishes this standard of review is found in Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).

    After fully considering the filings in this appeal, we conclude that there is no new, previously unavailable, evidence and that the administrative judge made no error in law or regulation that affects the outcome. 5 C.F.R. § 1201.115(d).

Therefore, we DENY the petition for review. The initial decision of the administrative judge is final. This is the Board's final decision in this matter. 5 C.F.R. § 1201.113.

## NOTICE TO THE APPELLANT REGARDING
## YOUR FURTHER REVIEW RIGHTS

You have the right to request the United States Court of Appeals for the Federal Circuit to review this final decision. You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

The court must receive your request for review no later than 60 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with the court no later than 60 calendar days after receipt by your representative. If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read

3

this law as well as review the Board's regulations and other related material at our web site, http://www.mspb.gov.

FOR THE BOARD:

Bentley M. Roberts, Jr.
Clerk of the Board

Washington, D.C.

CONCURRING OPINION OF NEIL A. G. MCPHIE

in

*Robin C. Olebara v. Department of the Treasury*

MSPB Docket No. DC-0752-03-0528-I-1

¶1      In *Cruz v. Department of the Navy*, 934 F.2d 1240, 1243-44 (Fed. Cir. 1991), the Federal Circuit, sitting *en banc*, held that jurisdiction over a constructive removal does not attach until an appellant *proves* that the appellant's resignation was involuntary and, thus, tantamount to an actual removal. Federal Circuit panel decisions both before and after *Cruz* have similarly held that Board jurisdiction over a constructive removal attaches only when the appellant proves that his resignation or retirement was involuntary. *See Shoaf v. Department of Agriculture*, 260 F.3d 1336, 1341 (Fed. Cir. 2001); *Staats v. U.S. Postal Service*, 99 F.3d 1120, 1124 (Fed. Cir. 1996); *Dumas v. Merit Systems Protection Board*, 789 F.2d 892, 895 (Fed. Cir. 1986); *see also Lloyd v. Small Business Administration*, MSPB Docket No. NY-0752-03-0018-I-1, slip op. ¶18 (July 15, 2004) (following *Cruz*); *Baker v. U.S. Postal Service*, 71 M.S.P.R. 680, 692-93 (1996) (requiring proof that an absence was involuntary before jurisdiction over a constructive suspension attaches).

¶2      Shortly after *Cruz* was issued, however, a three-judge Federal Circuit panel in *Spruill v. Merit Systems Protection Board*, 978 F.2d 679, 687-89 (Fed. Cir. 1992), departed from *Cruz*'s requirement that an appellant prove a constructive removal in order to establish jurisdiction. The *Spruill* panel held that jurisdiction over a constructive removal attaches when an appellant nonfrivolously *alleges* that the appellant's retirement or resignation was involuntary. More recently, additional Federal Circuit panels have stated emphatically that Board jurisdiction over a claim of involuntary resignation or retirement attaches upon the mere allegation of a nonfrivolous claim. *See Dorrall v. Department of the Army*, 301 F.3d 1375, 1380 (Fed. Cir. 2002); *Dick v. Department of Veterans Affairs*,

2

290 F.3d 1356, 1362 (Fed. Cir. 2002).  These later panel decisions make no mention of the controlling *en banc* decision in *Cruz. Id.*, *see also Colbath v. Department of the Army*, 89 Fed. Appx. 727 (Fed. Cir. 2004) (chastising the Board for not following *Spruill*, while failing to address *Cruz*)

¶3        Given these two divergent lines of cases from the Federal Circuit, I think that *Cruz* is ripe for review.  In my view, the *Cruz* approach to determining jurisdiction is unfair, illogical, and inconsistent with other courts. *See Lloyd*, slip op. ¶¶ 3-13 (McPhie, Acting Chairman, concurring).  While some Federal Circuit panels simply ignore *Cruz*, the Board must continue to follow this *en banc* decision, regardless of later panel decisions that contradict *Cruz*. *See* Fed. Cir. Rule 35(a)(2); *Palm Beach Isles Associates v. United States*, 208 F.3d 1374, 1379 n.3 (Fed. Cir.), *aff'd on reh'g*, 231 F.3d 1354 (Fed. Cir. 2000), *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982).  Therefore, it would be helpful to all concerned – from parties to practitioners, administrative judges, Board members, and even panels of the Federal Circuit – for the full court to revisit *Cruz* and clarify whether it remains the law.[*]

JUL 30 2004
_____
Date

*[signature]*
_____
Neil A. G. McPhie
Acting Chairman

---

[*] But for the controlling *en banc* decision in *Cruz*, I would, instead, follow the Federal Circuit panel decision in *Spruill*, and find that Board jurisdiction over a constructive action attaches when an appellant nonfrivolously alleges that the appellant's retirement or resignation was involuntary. *See Lloyd*, slip op. ¶ 1 (McPhie, Acting Chairman, concurring)

<u>CERTIFICATE OF SERVICE</u>

I certify that this Order was sent today to each of the following:

<u>By Certified Mail</u>

    Robin C. Olebara
    Post Office Box 2530
    Washington, DC 20013

<u>By Regular Mail</u>

    Randy W. Thomas, Esq.
    Office of Thrift Supervision
    Department of the Treasury
    1700 G Street, NW, 5th Flr.
    Washington, DC 20552

    Kenneth L. Bates
    U.S. Office of Personnel Management
    Employee Relations Division
    1900 E Street, NW, Room 7412
    Washington, DC 20415

_____
July 30, 2004
(Date)

_____
Ameeran Ali
Paralegal Specialist

TD 02-2378TR

## DEPARTMENT OF THE TREASURY FINAL AGENCY DECISION

In the matter of

### Robin Olebara v. John W. Snow, Secretary of the Treasury

## AUTHORITY

Under the authority vested in me by the rules and regulations of the Department of the Treasury and the U.S. Equal Employment Opportunity Commission (EEOC), I am rendering a final agency decision on the complaint of discrimination identified above.

## PRIOR DECISIONS

On April 8, 2003, the Department issued a final agency decision on a complaint designated TD 02-2378TM (the M designating it as a mixed case complaint), finding that Complainant had not been discriminated against concerning a reduction in force and other matters. Mixed case appeal rights to the Merit Systems Protection Board (MSPB) were provided. Complainant filed an appeal with the MSPB, and on July 31, 2003, an Administrative Judge issued a decision, dismissing the appeal for lack of jurisdiction. On July 30, 2004, the MSPB denied a petition for review and stated that the AJ decision was final.

A petition for review was filed with the EEOC. On October 19, 2004, the EEOC denied the petition and referred the matter to the Department for processing as a non-mixed case and ordered the Department to acknowledge to petitioner that it had received the remanded matter, to issue petitioner a copy of the Investigative File, and to notify petitioner of her hearing and decision rights.

## COMPLIANCE ACTION

On November 30, 2005, the Department acknowledged receipt of the EEOC decision and provided Complainant a copy of the Investigative File and her hearing and decision rights. The complaint was designated as TD 02-2378T, rather than TD 02-2378TM, since EEOC stated that non-mixed case processing was applicable. The complaint is now being designated as TD 02-2378TR since it was remanded from EEOC. On January 19, 2006, Complainant requested a final agency decision.

TD 02-2378TR – Robin Olebara                                    2

## ANALYSIS

The April 8, 2003 final agency decision, copy attached, sets out the relevant facts, the applicable standards, an analysis of the case, and a finding of no discrimination. Except for the appeal rights, we hereby incorporate that decision by reference.

## CONCLUSION

It is the decision of the Department of Treasury that a finding of no discrimination is appropriate in this matter. Accordingly, Complainant is not entitled to relief. EEOC non-mixed case appeal rights are attached.


_____
Mariam G. Harvey
Director
Office of Equal Opportunity and Diversity


_____
Date

DEPARTMENT OF THE TREASURY

OFFICE OF EQUAL OPPORTUNITY AND DIVERSITY

CERTIFICATE OF SERVICE

On this date, I mailed a copy of the final agency decision on the complaint filed by Robin Olebara, TD 02-2378TR, to the persons listed below by the methods specified. Including the Final Agency Decision, a copy of the prior April 8, 2003 decision, the Notice of Appeal Rights, the EEOC Form 573, and this Certificate, there are 19 pages.

_____    _____January 26, 2006_____
Reginald Shelton, Office Assistant    Date
Department of the Treasury
Office of Equal Employment and Diversity
1750 Pennsylvania Avenue, N.W., Room 8157
Washington, DC 20220
Telephone: 202-622-1160

**Complainant**    **Via First Class and Certified Mail**
Robin Olebara
P. O. Box 2530
Washington, D.C. 20013-2530

**Bureau EEO Officer**    **Via E-mail**
Cheryl Wright, Office of Equality and Workplace Principles,
Office of Thrift Supervision

**Bureau Counsel**    **Via E-mail**
Randy Thomas, Special Counsel, Office of Thrift Supervision

**Equal Employment Opportunity Commission**    **Via E-mail**
Charlotte Kelton, Compliance Officer, Office of Federal Operations
EEOC Petition No. 03A40142

**Treasury Complaint Center**    **Via E-mail**
James C. Parker, Operations Director
Jesus Gutierrez, EEO Intake Clerk

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Robin C. Olebara,
Complainant,

v.

John W. Snow,
Secretary,
Department of the Treasury,
(Office of Thrift Supervision),
Agency.

Appeal No. 0120063122[1]

Agency No. 02-2378TR

## DECISION

On March 11, 2006, complainant filed an appeal from the agency's January 26, 2006 final decision concerning her equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq.* The appeal is deemed timely and is accepted pursuant to 29 C.F.R. § 1614.405(a). For the following reasons, the Commission AFFIRMS the agency's final decision.

## BACKGROUND

At the time of events giving rise to this complaint, complainant worked as a TG-0318-12, Administrative Secretary II in the Office of Supervision, Compliance Policy in Washington, D.C. On June 12, 2002, complainant contacted an EEO Counselor and filed a formal EEO complaint on August 15, 2002, alleging that she was discriminated against on the bases of race (African-American), color (dark-complexion), sex (female), age (48 years old), and in reprisal for prior protected EEO activity when:

    (1)    the agency terminated her employment, effective July 27, 2002, as a result of a reduction-in-force (RIF);

---

[1] Due to a new data system, this case has been redesignated with the above referenced appeal number.

2                                                    0120063122

(2)    the agency delayed her retirement package to the Office of Personnel
       Management (OPM); and

(3)    after her termination, the agency did not offer her a position vacated by a White
       male co-worker.

At the conclusion of the investigation, complainant was provided with a copy of the report of
investigation and notice of her right to request a hearing before an EEOC Administrative Judge
(AJ). In accordance with complainant's request, the agency issued a final decision pursuant to
29 C.F.R. § 1614.110(b) concluding that complainant failed to prove that she was subjected to
discrimination as alleged.

In its final decision (FAD), the agency concluded that complainant was not discriminated
against as she alleged. Specifically, the agency found that, although complainant established a
*prima facie* case of discrimination, there were legitimate, nondiscriminatory reasons for its
actions. With regard to the RIF, the agency stated that complainant was one of 206 employees
affected in 2002. The agency also stated that, of the four individuals whose positions were
abolished, two were Black females and two were White females, and all were older than 40.
The agency further stated that the RIF was necessary due to the agency's budget deficits and
the fact that the Director had to balance the budget. The agency noted that the RIF was
conducted in accordance with applicable laws and regulations. The agency also noted that
complainant had no bumping rights because there was no employee in a lower tenure and
subgroup that she could displace and she possessed no retreat rights because there were no
employees with lower retention standing occupying positions she had previously filled. The
agency further noted that, although a Caucasian female secretary was retained after the RIF,
she was in the excepted service unlike complainant, and therefore was on a different retention
register.

With regard to complainant's allegation that the agency delayed submitting her retirement
package, the agency noted that complainant's effective retirement date was July 26, 2002 and
the retirement package was sent to the Office of Personnel Management (OPM) on August 8,
2002. The agency asserted that there were only eight work days between the retirement date
and the date the documents were sent to OPM. The agency also noted that, in a RIF situation,
a retirement package can not be processed until the employee is removed from the payroll
because RIF actions are sometimes canceled before the retirement date. The agency further
noted that the Benefits Specialist (African American, female, 49 years old) made an extra
effort to submit complainant's retirement package as early as possible because complainant had
expressed concern about receiving an annuity. With regard to not being offered the vacated
position, the agency asserted that it was a Senior Contract Specialist position that was not
filled. The agency also noted that, even if the position had been made available, complainant
did not meet the qualification requirements

3                                        0120063122

## CONTENTIONS ON APPEAL

On appeal, complainant contends, among other things, that but for lack of promotions, the questionable reorganizations, denial of opportunities, violations of RIF procedures, and OTS promotion and advancement policies, she would have been eligible to "bump and retreat" into positions that she had once held. Complainant also contends that the females on the RIF list were also the lowest paid employees. Complainant further contends that, before the effective date of the RIF, the agency engaged in actions to save non-targeted employees.

The agency did not submit a response.

## ANALYSIS AND FINDINGS

As this is an appeal from a decision issued without a hearing, pursuant to 29 C.F.R. § 1614.110(b), the agency's decision is subject to *de novo* review by the Commission. 29 C.F.R. § 1614.405(a). *See* EEOC Management Directive 110, Chapter 9, § VI.A. (November 9, 1999). (explaining that the *de novo* standard of review "requires that the Commission examine the record without regard to the factual and legal determinations of the previous decision maker," and that EEOC "review the documents, statements, and testimony of record, including any timely and relevant submissions of the parties, and . . . issue its decision based on the Commission's own assessment of the record and its interpretation of the law").

To prevail in a disparate treatment claim such as this, complainant must satisfy the three-part evidentiary scheme fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). He must generally establish a *prima facie* case by demonstrating that he was subjected to an adverse employment action under circumstances that would support an inference of discrimination. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 576 (1978). The *prima facie* inquiry may be dispensed with in this case, however, since the agency has articulated legitimate and nondiscriminatory reasons for its conduct. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 713-17 (1983); *Holley v. Department of Veterans Affairs*, EEOC Request No. 05950842 (November 13, 1997). To ultimately prevail, complainant must prove, by a preponderance of the evidence, that the agency's explanation is a pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Holley v. Department of Veterans Affairs*, EEOC Request No. 05950842 (November 13, 1997); *Pavelka v. Department of the Navy*, EEOC Request No. 05950351 (December 14, 1995).

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When a complainant alleges that he or she has been disparately treated by the employing agency as a result of unlawful age discrimination, "liability depends

4                                                    0120063122

on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (*citing Hazen Paper Co. v. Biggins*, 507 U.S. 604,610 (1993)). "That is, [complainant's] age must have actually played a role in the employer's decision making process and had a determinative influence on the outcome." *Id*.

After a careful review of the record, the Commission finds that the FAD correctly concluded that the agency did not discriminate against complainant on the bases of race, color, sex, age, and/or in reprisal for prior protected activity. The Commission also finds that complainant did not establish that more likely than not, the agency's articulated reasons were a pretext to mask unlawful discriminatory animus or retaliatory motive. In reaching this conclusion, we note that the record indicates that other than complainant's own assertions, there is not sufficient evidence that discrimination/retaliation occurred.

## CONCLUSION

Therefore, after a careful review of the record, including arguments and evidence not specifically addressed in this decision, we AFFIRM the agency's final decision.

### STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tends to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision or **within twenty (20) calendar days** of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29

5                                  0120063122

C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*
_____
Carlton M. Hadden, Director
Office of Federal Operations


FEB 2 3 2007
_____
Date

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Robin C. Olebara
P.O. Box 2530
Washington, DC  20013

Ruby M. Thomas, Director
Office of Equality/Workplace
Office of Thrift Supervision
1700 G Street, NW, 5th Floor
Washington, DC  20552

FEB **2 3** 2007
_____
Date


_____
Equal Opportunity Assistant

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Robin Olebara,
Complainant,

v.

John W. Snow,
Secretary,
Department of the Treasury,
Agency.

Request No. 0520070402
Appeal No. 0120063122
Agency No. 022378TM

## DENIAL

Complainant timely requested reconsideration of the decision in *Robin Olebara v. Department of the Treasury*, EEOC Appeal No. 0120063122 (February 23, 2007). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. *See* 29 C.F.R. § 1614.405(b).

Complainant filed a formal EEO complaint on August 15, 2002, alleging that she was discriminated against, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq.*, on the bases of race (African-American), color (dark-complexion), sex (female), age (48 years old), and in reprisal for prior protected EEO activity when: (1) the agency terminated her employment, effective July 27, 2002, as a result of a reduction-in-force (RIF); (2) the agency delayed her retirement package to the Office of Personnel Management (OPM); and (3) after her termination, the agency did not offer her a position vacated by a White male co-worker.

After reconsidering the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.40(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 0120063122 remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

### RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations


MAY 1 7 2007

Date

3                                              0520070402

## <u>CERTIFICATE OF MAILING</u>

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.**  I certify that this decision was mailed to the following recipients on the date below:

Robin Olebara
P.O.B.2530
Washington, DC  20013

Mariam G. Harvey, Director, EO Programs
Office of Equal Opportunity & Diversity Division
Department of the Treasury
1750 Pennsylvania Ave., NW  Rm: 8157D
Washington, DC  20220

MAY 1 7 2007
_____
Date

_____
Equal Opportunity Assistant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                :
ROBIN OLEBARA,                  :
                                :
            Plaintiff,          :
                                :
        v.                      : Civil Action No.
                                : 07-1487(JR)
HENRY PAULSON, SECRETARY OF     :
THE TREASURY,                   :
                                :
            Defendant.          :
                                :
- - - - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, February 26, 2008

Deposition of

ROBIN OLEBARA

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Kelly Carnegie, Notary

Public in and for the District of Columbia, in the Office of

Thrift Supervision, Department of the Treasury, 1700 G

Street, N.W.,  Washington, D.C., commencing at 9:34 a.m.

APPEARANCES:


On Behalf of the Plaintiff:


        ROBIN OLEBARA, PRO SE

        P.O. Box 2530

        Washington, D.C.  20013



On Behalf of the Defendant:


        CHRISTOPHER A. STERBENZ, ESQ.

        ELIZABETH R. MOORE, ESQ.

        Office of Thrift Supervision

        Department of the Treasury

        1700 G Street, N.W.

        Washington, D.C.  20552

Page 18

1          A    I was RIF'd.  It wasn't in lieu of, I was RIF'd.  I

2    was involuntarily --

3          Q    And your retirement annuity you received from the

4    federal government was reduced, as you said, by 14 percent.

5    Is that right?

6          A    It was reduced by 14 percent based on my age.

7          Q    Okay.  That's because you retired, I think, at the

8    age of 48 rather than at 55.  Is that right?

9          A    I can't -- whatever the calculation would be.  I

10   don't have that calculated right at this moment.

11         Q    Okay.  So besides the reduction in your retirement

12   annuity and the loss of your income from your job, did you

13   sustain any other financial losses that you're suing on in

14   this lawsuit?

15         A    Yes.

16         Q    What's that?

17         A    It would be the savings that I had put forth in

18   both my TSA and the OTS plan.  Additionally, OTS had offered

19   during my employment insurance, health insurance, and --

20   excuse me, not health insurance, I'm speaking of life

21   insurance -- and as a result of me being fired at the time

22   that I was, I had not gone into that service for more than

Page 25

1    in force, or the firing, or before I was fired, and there

2    were positions that I could have bumped to.

3         Now, if you're asking me what --

4    **Q    What position?  Okay.  What position in the agency**

5    **were you -- do you believe you were entitled to bump somebody**

6    **from?**

7    A    Any of those that were contract specialists, series

8    positions.

9    **Q    Do you have any witnesses that will testify that**

10   **you were entitled to bump somebody else?**

11   A    What type of witness would I need for that? You

12   just follow the regulations.  It's not about a witness.

13   **Q    Do you have any witnesses that would testify that**

14   **you were qualified and entitled to bump someone in the**

15   **contract specialist field?**

16   A    I would be my own witness.  I certainly was

17   qualified.  I was qualified when I was brought here as a

18   contract --

19   **Q    You're certainly competent to testify about**

20   **yourself, that's true.  Anybody besides yourself?**

21   A    I didn't think of getting that.  If ever this thing

22   goes forward and I'm provided with an attorney, I'm sure that

Page 26

1    we will be able to get that type of information.

2        Q    But you're proceeding without an attorney, so you

3    need to provide this stuff now in the case. The case is going

4    to go forward whether or not you're represented by an

5    attorney.

6        A    I'm well aware of that.

7        Q    All right.

8        A    That's what seems to be going on.  So I would have

9    to be my own witness.

10       Q    Okay.  But at this point, you don't have any other

11   witnesses that are going to testify --

12       A    What witnesses would an employee --

13       Q    Witnesses that are going to testify about your

14   entitlement to bump another employee or to retreat.  You

15   don't have any other witnesses other than yourself at this

16   point?

17       A    I would imagine the Office of Personnel Management

18   would be -- would just -- the Federal Employment Agency would

19   be the guidance with that. That would be a witness, I would

20   imagine, if that's --

21       Q    Who at OPM is going to testify for you?

22       A    I don't know because I have not even talked to

Page 27

1    anyone at OPM.

2         Q    Okay.  Let's go to page 3 of your complaint, okay?

3         A    Exhibit 1?  Back to --

4         Q    Yeah, Exhibit 1.  Okay.  Paragraph three,

5    handwritten number three, you state that OTS targeted certain

6    employees.  Who targeted them?

7         A    Whoever placed -- whoever placed us on the list.  I

8    wouldn't --

9         Q    Who?

10        A    I don't know who made those decisions.

11        Q    Okay.  And why did they target those employees for

12   RIF?

13        A    I would imagine it was easy to do.

14        Q    Did they --

15        A    When you're not the one making -- when you're not

16   the one in power, then you would have to just suffer.

17        Q    Did they target them because they were female?

18        A    I would imagine -- I contend that we were targeted

19   because we were black.

20        Q    Okay.  So you're not -- so what you're saying is

21   that the reason that you were -- that the targeting that was

22   done was because of your race?

Page 28

```
 1          A    It was because of our race, and we're also females.

 2    So it's -- I don't think it's an either/or but both/and.

 3          Q    Were those positions targeted because they were --

 4    they were the types of jobs that the agency thought were

 5    surplus to the mission?

 6          A    I would doubt that because they had sufficient

 7    white employees at the same grade level and they were not

 8    targeted.

 9          Q    Okay.  So let me ask you again about witnesses.  Do

10    you have any witnesses that are going to testify to support

11    your allegation in line three?

12          A    Just -- I guess I'll just do a blanketed statement

13    on this.  I have no witnesses at this time.  I am pro se.

14          Q    Okay.

15          A    And that's for all of your -- that's would be the

16    standard response for all of your questions about witnesses.

17          Q    Okay.  So the only witness that you're going to

18    call in the trial of this case is yourself?

19          A    I don't even know that I would call myself. I'm not

20    an attorney, and I am not even going to pretend in this case,

21    so --

22          Q    How do you expect to win a case if you're not even
```

Page 29

1      **going to testify yourself?**

2          A    I -- I hope to win the case, and I'm certainly not

3      going to try this case pro se.  It would be -- it would be

4      ludicrous to even attempt to do so.

5          Q    **That's what you're doing now, though.**

6          A    I'm following Judge Robertson's orders.  He had

7      asked that I present myself here for this deposition without

8      an attorney, and that's why I'm here.

9          Q    **Okay.**

10             MR. STERBENZ:  The record should reflect the

11     witness's tape recorder has gone off, so we're going to take

12     a moment and let her add another one in, add a blank cassette

13     in.

14             THE WITNESS:  Ready?

15             MR. STERBENZ:  Uh-huh.

16             BY MR. STERBENZ:

17         Q    **Let's look at line four.  It states that you were**

18     **targeted and deliberately and involuntarily retired using the**

19     **RIF action.  Do you believe that the RIF was formulated in**

20     **order to get rid of you?**

21         A    I think that the RIF was used -- I would -- I did

22     not contend that the RIF was formulated to attack me or to

Page 48

1    to --

2       A    No, I didn't make a written request.

3       Q    Did you ask somebody orally for career assistance

4    transition?

5       A    I don't remember.

6       Q    Okay.  At the time of the RIF, at this time, did

7    you apply for any other jobs in the government?

8       A    I'm not sure that I did or not.

9       Q    Did you apply for any other jobs in the private

10   sector?

11      A    At that time, no, I did not.

12      Q    Okay.

13      A    I know I didn't apply in the private sector. I

14   don't know if I sent my -- what we would call a 171 out to

15   other federal agencies.

16      Q    All right.  Let's go to page 4 of your complaint,

17   and at the top there, the second bullet, handwritten number

18   two, that you were forced to retire and voluntary retired

19   with a 14 percent penalty.  We did talk about that earlier,

20   touched on it, didn't we? Did we talk about that earlier?

21      A    I think we did.

22      Q    Okay.

Page 49

1          A    More than once.

2          Q    So let's go to paragraph number one that's circled

3      here --

4          A    Okay.

5          Q    -- where you state you contend that "OTS

6      intentionally delayed your retirement package to OPM." So as

7      I understand this and from our discussions earlier about this

8      14 percent penalty, the reduction in your annuity comes

9      because of the fact that you retired early and not

10     necessarily because of any delay in the submission of the OTS

11     -- of your paperwork by OTS to OPM.  Is that right?

12         A    Yes.  Those are two separate situations.

13         Q    So even if OTS had filed the, as you say, filed

14     your retirement paperwork in a timely manner, you still would

15     have had that 14 percent reduction in your annuity?

16         A    Yes, because I was fired before the 55 year age

17     requirement.

18         Q    Okay.  Sandy Thomas is the person that submitted

19     your retirement paperwork to OPM.  Is that right?

20         A    I don't know.

21         Q    Do you know Sandy Thomas?

22         A    I do know her.

Page 66

1       Q    Did anybody in the agency ever use the N word to

2   refer to you?

3       A   I don't know.

4       Q    Did you ever hear anyone use a racial epithet

5   directed at you?

6       A   Well, the N word is not the only way that you can

7   be discriminated against, racism.

8       Q    I understand.  Did any of your supervisors ever say

9   that I don't like you because you're black?

10      A   What you told me to say, if I can't give you a

11   name, then you don't want a response.  So I don't know what

12   else, you know, to say in that regard.

13      Q    Any of your -- any of your supervisors ever say we

14   don't like you because you're 48 years old?

15      A   I never heard that age was the issue.  What I had

16   heard was it was because I was black, a dark-complexion black

17   female.

18      Q    But in your complaint you're suing on the basis of

19   age?

20      A   Exactly.

21      Q    Age discrimination.

22      A   Because I --

Page 67

1      Q      So what -- if you were 48 years old, you were

2      probably one of the youngest people in this agency at that

3      time.  You still would be today.  Was there ever a situation

4      where you were -- people talked about you being too old or

5      too young to be employed?

6      A      I do have -- it's part of the related case.  There

7      was a situation where there was an age factor.

8      Q      Okay.  Who?  Who was it?  How was this age factor

9      --

10     A      Do you want me to respond?  Because I'm going to

11     have to tell my story.

12     Q      Yeah.

13     A      Okay.  When I was first hired in March of '88, in

14     '88, months later, the Office of Procurement Management

15     branch was reorganized, and it was made into a division, the

16     Procurement Management Division.  And at that time, the black

17     employees were -- and I worked in this office -- we were

18     placed in a position as a buyer.  And at that time, I was

19     under 40, and --

20     Q      In 1988 you were 34 years old.

21     A      I would contend that I was used as a target for

22     those people -- there were four of us that were affected, and

Page 68

1    I was the only one who was under 40. Everyone else was over

2    40.  So the game plan was they couldn't use race -- excuse

3    me, age -- as a factor because I was a included in that.

4         Q    That was in 1988.  What about in 2002?  In 2002 did

5    anybody ever say anything to you that you were too old to

6    work at this agency, and that's why we're getting rid of you?

7         A    I wasn't told that, but I was 48.

8         Q    Okay.  Did your boss say that we're getting rid of

9    all the old people in the agency?

10        A    Well, if I'm looking at it, or in reviewing it,

11   understanding that both Miriam Neale and Terri Radcliff were

12   younger than I, and they were doing procurement work and I

13   wasn't allowed to retreat, maybe in fact age was a major --

14   age was a factor because they were both under.

15        Q    Okay.  Did anyone tell you that, that the reason

16   why you're not being allowed to retreat is because of your

17   age?

18        A    I wasn't told that.

19        Q    No?  Okay.  Did anyone ever tell you --

20        A    But I still contend that.

21        Q    Did anyone ever tell you the reason you're not

22   being allowed to bump or retreat is because of the complexion

Page 79

1    review that when it's ready?

2         THE WITNESS:  I don't know that I need to review

3    it, since I have the recording myself.  There was a period of

4    time when it actually had stopped, and I don't know for what

5    period of time.  But for what it's worth, I mean, I've

6    responded and -- I mean, I haven't changed my answers.

7         MR. STERBENZ:  You waive?

8         THE WITNESS:  Yes, I do.  If I can get a copy -- is

9    there a fee for that to me?

10        MS. MOORE:  We'll provide you with a copy.

11        THE WITNESS:  I would like that, if you don't mind.

12   Thank you.  If you can tell by my income, I can't afford it.

13        MR. STERBENZ:  All right.  Thank you very much.  We

14   can go off the record, then.  We're done.

15        THE WITNESS:  Okay.

16        (Whereupon, at 11:10 a.m., the deposition was

17   concluded.)

18        (Signature waived.)

19              *  *  *  *  *

20

21

22

DEPOSITION OF ROBIN OLEBARA
CONDUCTED ON TUESDAY, FEBRUARY 26, 2008

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2    I, Kelly Carnegie, Certified Shorthand

3    Reporter, Registered Professional Reporter, the

4    officer before whom the foregoing proceedings were

5    taken, do hereby certify that the foregoing transcript

6    is a true and correct record of the proceedings; that

7    said proceedings were taken by me stenographically and

8    thereafter reduced to typewriting under my

9    supervision; and that I am neither counsel for,

10   related to, nor employed by any of the parties to this

11   case and have no interest, financial or otherwise, in

12   its outcome.

13   IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 29th day of

15   February, 2008.

16   My commission expires:

17   February 9, 2012

18

19

20   _____

21   NOTARY PUBLIC IN AND FOR THE

22   DISTRICT OF COLUMBIA

ROBIN OLEBARA,                    :

      Plaintiff,              :

        v.                    :          Civil Action No. 07-1487 (JR)

JOHN W. SNOW, Secretary,     :
Department of the Treasury,

                   :

      Defendant.              :

                   :

## PLAINTIFF'S REPLY TO:

Defendant's Interrogatories and Request for Production of Documents

1. Please provide the name, address and telephone number of each person plaintiff believes may have information relevant to her claims.

***Answer 1***:    Pro Se, None at this time

2. Please provide the name, address and telephone number of each person plaintiff may call to testify as a witness at any trial of this action.

***Answer 2***:    Pro Se, None at this time

3. Please provide the name, address and telephone number of any expert plaintiff has retained in connection with this action.

*Answer 3*:    Pro Se, None at this time

4. Please provide a written computation of each category of damages that plaintiff claims in this action.

*Answer 4*:    Pro Se, None at this time

5. Please identify each job, whether full or part-time, that plaintiff has held from July 26, 2002 to date, including the name, address and telephone number of the employer, name of plaintiff's supervisor, dates of employment and job title or description.

*Answer 5*:  Since being involuntarily retired/fired from OTS, with the exception of 5D, Plaintiff has only worked temp assignments on a part-time basis (no paid holiday or leave earned) through temporary agencies; and, did not keep a list of the information requested, otherwise:

2

5A:        July 26, 2002 - December 31, 2002    None

5B:        2003                Select Staffing (Business Closed)
                               See W-2, enclosed

5C:        2004                Select Staffing (Business Closed)
                               See W-2, enclosed

5D:        2005                IKG Cultural Resource Center
                               4th & H St., NE; WDC 20002 (Location Closed)
                               Administrative Assistant (PT)
                               Mr. Tony Browder, Owner
                               (301) 853-2465

5E (1):    2006                City Staff Inc.
                               Ms. Nika Rawlings
                               (202) 861-4200

5E (2):    2006                KForce Inc.
                               Ms. Agnes Jackson
                               (202) 354-8614

5F (1):    2007                City Staff
                               Ms. Nika Rawlings
                               (202) 861-4200

5F (2):    2007                Manpower International Inc.
                               Ms. Donna Jackson
                               (202) 331-8300

5F (3):    2007                KForce, Inc.
                               Ms. Agnes Jackson
                               (202) 354-8614

6. Please provide the dates of any period from July 26, 2002 to date in which plaintiff was self-employed and briefly describe the work plaintiff engaged in during that time.

*Answer 6*:    None

Document Requests

1. Please provide a copy of each document or record of information in any form that plaintiff may use to support her claims in this action. (Plaintiff does not need to provide copies of any documents already in the Equal Opportunity Complaint File, Treasury Case No. 02-2378TM.)

*Answer 1*:  No other known

2. Please provide a copy of each document or record of information in any form that plaintiff may use to establish or support her damages in this action.

*Answer 2*:  Documents as provided in Treasury Case No. 02-2378TM

4

3.  Please provide a copy of all documents that provide a record of plaintiff's

earnings from 2002 to date, including but not limited to pay stubs and federal and

local income tax forms and returns.


***Answer 3:***  Earning Documents Enclosed:

- 2008 OPM's Notice of Annuity Adjustment dated 02/01/2008; and,
- 2002-2007 Federal and DC Tax Returns with 1099s and W-2s


4.  Please provide a copy of all documents relating to any medical or mental health

treatment that plaintiff has received from 2002 to date for any medical or health

problems for which plaintiff may seek damages in this action.


***Answer 4:***  No known supporting documents for damages.


Plaintiff's reply with enclosures mailed via U.S. Postal Service Tuesday,

February 12, 2008, to:


Ms. Elizabeth R. Moore
Special Counsel/Ethics Counsel
Office of Thrift Supervision
1700 G Street, N.W.
Washington, DC  20552


_____          2/12/2008
Robin Olebara, Plaintiff                              Date